# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 12-20695

———————

United States Court of Appeals
Fifth Circuit

**FILED**

March 10, 2015

Lyle W. Cayce
Clerk

NORTH CYPRESS MEDICAL CENTER OPERATING COMPANY, LIMITED; NORTH CYPRESS MEDICAL CENTER OPERATING COMPANY GP, L.L.C.,

> Plaintiffs - Appellants Cross-Appellees

v.

CIGNA HEALTHCARE; CONNECTICUT GENERAL LIFE INSURANCE COMPANY; CIGNA HEALTHCARE OF TEXAS, INCORPORATED,

> Defendants - Appellees Cross-Appellants

————————————

Appeals from the United States District Court
for the Southern District of Texas

————————————

Before STEWART, Chief Judge, and HIGGINBOTHAM and ELROD, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is a dispute over an insurer's obligation to pay a hospital for medical services provided to insured patients. Under the insurance plans, patients are to pay for part of their hospital bills and the insurance company covers the rest. The parties dispute whether the hospital may discount patients' portion of the bills without affecting the patients' coverage under their insurance plans.

No. 12-20695

I.

Houston medical provider North Cypress Medical Center Operating Co., Ltd. and North Cypress Medical Center Operating Co. GP, LLC (collectively, "North Cypress" or "the hospital") sued Cigna Healthcare, Connecticut General Life Insurance Company, and Cigna Healthcare of Texas, Inc. (collectively, "Cigna") for breach of healthcare plans administered or insured by Cigna. North Cypress principally argues that Cigna failed to comply with plan terms and underpaid for covered services. Cigna counter-claimed, arguing that it paid more than was owed; that North Cypress as an out-of-network provider did not charge the patients for coinsurance, but billed Cigna as if it had. The district court dismissed or granted summary judgment on all claims.

## A. Cigna's plans

The more than 8,000 insurance plans governing the claims in this case sort into classes along several different lines. Most are funded by employers, with Cigna acting only as an administrator—"Administrative Services Only" or "ASO" plans.[1] Some are funded by Cigna itself—"fully insured" plans. Some limit out-of-network benefits to a set percentage of a charge based on Medicare pricing—"MRC2" plans—while other plans limit reimbursement to a percentage of rates charged by other providers in the geographic area— "MRC1" plans. Patients generally assigned their rights under their insurance plans to North Cypress, though Cigna disputes the existence and adequacy of many assignments.

In general, across the different plans members can seek care from an in-network or out-of-network provider. In-network providers contracted with Cigna to provide services at agreed prices. Out-of-network providers did not.

---

[1] Although Cigna only administered many of the plans, we will sometimes speak in terms of what Cigna "owes" for simplicity.

No. 12-20695

Members are responsible for certain deductibles, copayments, or coinsurance amounts, which are larger if the provider is not in the network.

Cigna maintains that these cost-sharing mechanisms ensure that in-network providers are less costly to patients than out-of-network providers. For example, in some of the plans at issue, once the member satisfies the deductible, the member's coinsurance level at in-network providers is 80%; the plan paying 80% and the member 20%. With an out-of-network provider, the member faces both a higher deductible and a greater coinsurance burden; the plan paying 60% and the member 40% of remaining costs.

Cigna argues that these cost-sharing mechanisms are essential to lower medical and health insurance costs; that incentivizing members to choose in-network providers—who charge both the members and the plans less—reduces overall plan costs, an incentive lost when an out-of-network provider does not require patients to pay all of the coinsurance or other obligations contemplated by the plans.

Relatedly, some or all of the plans at issue[2] contain the following or similar provisions:

- "[P]ayment for the following is specifically excluded from this plan: . . . charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan."[3]

- "[Y]ou and your Dependents may be required to pay a portion of the Covered Expenses for services and supplies. That portion is the Copayment, Deductible or Coinsurance."

- "Coinsurance means the percentage of charges for Covered Expenses that an insured person is required to pay under the plan."

---

[2] There are thousands of plans involved in this case, but only a few appear in the record. Both parties make broad generalizations about plan language.

[3] At least one of the plans, however, states that this exclusion does not apply if the "expenses are considered Medically Necessary."

3

No. 12-20695

- "The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles, copayments and coinsurance."

## B. North Cypress and its billing practices

North Cypress opened its Houston hospital in 2007, boasting a "5 Star Atmosphere" and "all private patient suites with upscale room accommodations, including wood floors and trim[ and] flat screen televisions."[4] North Cypress and Cigna unsuccessfully negotiated for an in-network contract prior to the opening. North Cypress then opened as an out-of-network provider after notifying Cigna it was implementing a "prompt pay discount" program through which some patients, for whom North Cypress was out-of-network, would get a discount on their coinsurance obligation if they paid upfront or within a short period of time.[5] North Cypress argues that its discount approach made good business sense because collecting on patient medical bills is expensive and often unrewarding.

North Cypress calculates the total cost of care for a patient based on its main fee schedule—called the "Chargemaster"— which contains prices usually four to six times Medicare rates.[6] Without the prompt pay discount, a patient might be expected to pay 40% of this total Chargemaster cost as her out-of-network coinsurance responsibility, while Cigna would cover the other 60%. If the total Chargemaster cost of care was $10,000, for example, the patient would be expected to cover $4,000. Cigna does not contend that it was ever charged more than its 60% share (here, $6,000) of the Chargemaster rates—

---

[4] As advertised on its website. *See* R. 9339.

[5] While the parties appear to agree that emergency services and services under government-sponsored plans were not to be discounted under the "prompt pay" program, Cigna asserts that North Cypress discounted such services as well.

[6] In the admitting process, patients acknowledge their ultimate responsibility for this total cost of care, even the portion covered by insurance.

No. 12-20695

the dispute solely concerns the fact that the *patients'* $4,000 portion of the bill was reduced in various ways.

When applying the prompt pay discount, rather than billing the patient $4,000 North Cypress would calculate a much lower amount. First, instead of starting with the total Chargemaster cost of care, North Cypress would start with a lower base rate—125% of the Medicare rate for the services provided. For example, instead of $10,000, the base rate might be $2,500. Then instead of multiplying this reduced base rate by 40%, North Cigna would multiply it by 20%—the patient's *in-network* coinsurance rate. As a result of the discount, the patient in this example would be billed only $500 rather than $4,000. In contrast, Cigna's responsibility was unchanged; North Cypress would file a claim form reporting its total Chargemaster cost to Cigna and expect the insurer to pay its 60% share—$6,000.

If the patient paid the discounted coinsurance amount on time, North Cypress did not bill or attempt to collect any additional amount from the patient.[7] North Cypress would thus collect a substantially reduced amount from the patient in exchange for prompt payment. Importantly, if Cigna refused to pay its full 60% of the Chargemaster rate, North Cypress did not attempt to collect that amount from the patient.

### C. Cigna's investigation and response

Cigna was concerned when it learned of North Cypress's prompt pay discount, believing the program would undermine plan incentives designed to encourage providers to join Cigna's network, and patients to seek care within that network. Despite Cigna's concerns, it initially paid North Cypress based

---

[7] The parties appear to dispute whether North Cypress would bill or attempt to collect the patients' full non-discounted portion of the bill (e.g. their full 40% of the total Chargemaster cost) if they *failed* to pay the discounted amount on time.

on the Chargemaster rates as billed.[8] However, even as it was paying these charges, Cigna mobilized an "interdisciplinary team" to address North Cypress's billing practices and pressure North Cypress to come in-network.[9] The team came up with a multi-pronged approach, which contemplated making "[n]o payment or reduced payment" to North Cypress and convincing plan sponsors to switch to cheaper MRC2 reimbursement, among other measures.[10] Cigna's Special Investigations Unit ("SIU") also surveyed a few dozen members about their experience with North Cypress and eventually received 27 responses,[11] assertedly confirming its suspicion that North Cypress was engaging in "fee forgiving."[12]

In November 2008, Cigna informed North Cypress of SIU's investigation and adopted its "fee-forgiving protocol." Cigna began reimbursing North Cypress for medically necessary services at drastically reduced rates. The sharp reduction was based on two key claims: (1) Cigna claimed that patients were *not insured* for medical costs unless North Cypress billed them for the patient coinsurance responsibility contemplated by their plans; (2) Cigna posited that most North Cypress patients were billed only $100 or less.[13] To reiterate, Cigna's claim was that if North Cypress did not bill patients for their

---

[8] In other words, Cigna accepted the Chargemaster rate as the total cost of care (subject to the plan's Maximum Reimbursable Charge), and calculated its share of the cost based on that rate.

[9] R. 9006, 9021.

[10] R. 9009.

[11] The parties dispute whether the survey was random. The district court found that the results showed 12 members were billed nothing, 6 members were billed $102 or less, and 7 members were billed amounts of $320 or more. Two members could not remember what they were billed. No members were billed the amount contemplated by their insurance plans.

Cigna also points to other evidence, such as notices from North Cypress, phone calls with North Cypress employees, and a North Cypress flier.

[12] Cigna refers to the practice of not charging members the full rate for their share of costs under the plan, while continuing to charge Cigna its share as "fee forgiving."

[13] A position drawn largely from the results of its modest survey.

coinsurance responsibility, the patients' had *no insurance coverage* for their medical costs. Given its position that North Cypress billed each patient $100 or less—a miniscule proportion of the plans' anticipated patient coinsurance responsibility—Cigna asserted that patients were only insured for a likewise miniscule proportion of their medical costs. Cigna justified its interpretation primarily based on language in at least some of the plans excluding from coverage "charges which you are not obligated to pay or for which you are not billed."

In practice, if a member's plan required Cigna to pay 60% of the cost of out-of-network care, and North Cypress reported a $10,000 total cost of care, Cigna would not pay $6,000. Instead, Cigna would assume the patient was billed $100; working backwards from that assumption, Cigna would calculate the "total cost of care" to be only $250. Accordingly, it would reimburse the hospital only $150—sixty percent of $250. Cigna told North Cypress it would calculate payments this way until clear evidence was presented that (1) the charges shown on the claim forms were actual charges for services rendered, and (2) the plan member had paid the applicable out-of-network coinsurance and deductible in accordance with the relevant plan.[14] North Cypress did not disclose the amount it billed any particular patient.[15] The hospital appealed some of Cigna's payment decisions, and argues that it would have been futile to appeal the rest.

Under the plans funded by Cigna rather than employers, it seems clear that Cigna directly benefited from its drastic reductions in reimbursement— Cigna kept the money. The parties dispute whether Cigna likewise stood to

---

[14] When reduced payments were appealed, Cigna would likewise explain that it would not increase payment unless it was given evidence that the patient was held financially responsible for her portion of the total charge reported by North Cypress.

[15] Mem. and Order of August 10, 2012, 14.

No. 12-20695

gain a portion of the "savings" when it reduced payments under the more numerous Administrative Services Only plans.

### D. "Discount Agreements"

Cigna employed third-party re-pricing agents. The re-pricing agents, acting on behalf of Cigna, entered into agreements with medical providers including North Cypress to pay negotiated amounts for particular benefit claims. For example, a provider might accept a reduced reimbursement amount in exchange for quick payment from the insurance plan. All agreements stated that they were subject to the terms of the underlying plan covering the patient. North Cypress and Cigna entered into hundreds of these contracts with regard to specific claims. Cigna later refused to pay the negotiated amounts agreed to in the contracts because of the same concerns about "fee forgiving."

### II. District Court Proceedings

North Cypress filed a First Amended Complaint asserting that Cigna failed to comply with group plan terms, breached fiduciary duties, failed to provide full and fair reviews of denied claims, violated claims procedures, and failed to provide requested information, all in violation of ERISA. The First Amended Complaint also asserted state-law breach of contract claims and violations of the Texas Insurance Code. The district court dismissed the Texas Insurance Code claims, concluding they were preempted by ERISA.[16] North Cypress then filed a Second Amended Complaint, adding claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The district court dismissed the RICO claims under Rule 12(b)(6).[17]

---

[16] Mem. and Order of March 2, 2011, 29-33.
[17] Mem. and Order of November 3, 2011, 21.

8

No. 12-20695

Cigna filed its answer and counterclaims, asserting state-law claims for fraud, negligent misrepresentation, and unjust enrichment. The district court dismissed these claims, concluding they were preempted by ERISA. Cigna filed an amended complaint asserting ERISA claims, and the parties filed cross-motions for summary judgment.

The district court dismissed North Cypress's ERISA claims for want of standing[18] and Cigna's ERISA claims as time barred.[19] Finally, the district court granted summary judgment against North Cypress's breach of contract claims, concluding there was no breach.[20]

North Cypress appeals and Cigna cross-appeals.

III.

"Standing is a question of law that we review *de novo*."[21] We review "all facts expressly or impliedly found by the district court" for clear error.[22] We also review *de novo* the district court's grant of summary judgment.[23] A party may obtain summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[24]

We review *de novo* the district court's decision to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6),[25] accepting "as true the well-pleaded factual allegations in the complaint."[26] To survive a Rule 12(b)(6)

---

[18] Mem. and Order of June 25, 2012, 18-19.

[19] Mem. and Order of July 25, 2012, 17.

[20] Mem. and Order of August 10, 2012, 20.

[21] *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002).

[22] *Id.*

[23] *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

[24] *Id.* (quoting Fed. R. Civ. P. 56(c)).

[25] *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).

[26] *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Causey v. Sewell Cadillac–Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir. 2004)).

No. 12-20695

motion to dismiss, the complaint "does not need detailed factual allegations," but it must provide the plaintiff's grounds for entitlement to relief—including factual allegations that, when assumed to be true, "raise a right to relief above the speculative level."[27]

## IV.

North Cypress appeals the district court's rejection of its ERISA claims for lack of standing. As the party invoking federal jurisdiction, North Cypress bears the burden of showing that it has standing to assert a legal claim for each of the benefit claims at issue.[28] "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."[29] The merits here include the question of what "charges which you are not obligated to pay or for which you are not billed" means under the plans, and thus the amount of reimbursement due North Cypress.

Healthcare providers may not sue in their own right to collect benefits under an ERISA plan,[30] but may bring ERISA suits standing in the shoes of their patients. "It is well established that a healthcare provider, though not a statutorily designated ERISA beneficiary, may obtain standing to sue derivatively to enforce an ERISA plan beneficiary's claim."[31] North Cypress received express assignments of rights from at least some of its patients.

An "injury in fact—an invasion of a legally protected interest which is (a) concrete and (b) actual or imminent, not conjectural or hypothetical"—is the

---

[27] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[28] *See Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011).

[29] *Cole v. General Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) (quoting *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007)).

[30] *See* 29 U.S.C. § 1132(a)(1)(B).

[31] *Harris Methodist Fort Worth v. Sales Support Servs.*, 426 F.3d 330, 333-34 (5th Cir. 2005) (citing *Tango Transport v. Healthcare Fin. Servs. LLC*, 322 F.3d 888, 893 (5th Cir. 2003)).

No. 12-20695

first "irreducible constitutional minimum [element] of standing."[32] Cigna argues that its refusal to pay based on the full charges North Cypress reported did not cause patients any injury because they were never at imminent risk of out-of-pocket expenses; that North Cypress did not bill patients for the amounts Cigna did not pay and never intended to do so. The district court agreed with Cigna, and found the patients—and thus North Cypress—lacked standing. We cannot agree.

A.

Cigna agreed to pay plan members money ("benefits") to reimburse certain medical costs incurred at out-of-network providers.[33] The patients sought medical care from such a provider—North Cypress—and assigned to it their rights under their Cigna plans.[34] Cigna allegedly did not pay the patients or their assignee the full amount it owed to the patients under the contract, and North Cypress sought to enforce its assigned contract rights against Cigna.

The Ninth Circuit has addressed the issue of standing in this situation head-on.[35] There, as here, the insurer argued that there was no injury in fact to patients because they were not billed for the amount allegedly due from the insurance plans. Further, "[d]efendants argue[d] that since [the provider] stands in the shoes of, and can have no greater injury than, its assignors, [it] has not suffered injury in fact."[36] The Ninth Circuit explained that:

---

[32] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).

[33] To simplify, we speak at times of Cigna's obligations to insureds, but we recognize that Cigna only administers, and does not fund, many of the plans at issue. This distinction is not of consequence in our discussion of standing.

[34] Cigna disputes the adequacy and existence of assignment for many claims. We leave it to the district court to resolve these fact-sensitive issues on remand.

[35] *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1288-91 (9th Cir. 2014).

[36] *Id.* at 1289.

No. 12-20695

> The flaw in [the insurer's] argument is that they would treat as determinative [the provider's] patients' injury in fact as it existed after they assigned their rights to [the provider]. We agree that . . . the patients have not suffered injury in fact *after* assigning their claims. But the patients' injury in fact after the assignment is irrelevant. As assignee, [the provider] took from its assignors what they had *at the time of* the assignment. At the time of the assignment, Plan beneficiaries had the legal right to seek payment directly from the Plans for charges by non-network health care providers. If the beneficiaries had sought payment directly from their Plans for treatment provided by [the provider], and if payment had been refused, they would have had an unquestioned right to bring suit for benefits. No one . . . would contend that the beneficiaries would have lacked Article III standing in that circumstance. However, instead of bringing suit on their own behalf, plaintiffs assigned their claims to [the provider].[37]

Likewise, the Southern District of New York recently held that if a provider "has alleged it is an assignee of the Patient and that [the insurer] failed to fulfill its contractual obligations to the Patient; this is all that is required to demonstrate Article III standing."[38]

The reasoning of these courts has force; patients generally assign their claims in the admissions process well before their presentment to Cigna. We then look to the rights of the patient at the time of assignment. The fact that the patient assigned her rights elsewhere does not cause them to disappear.

There is more: a patient suffers a concrete injury if money that she is allegedly owed contractually is not paid, regardless of whether she has directed the money be paid to a third party for her convenience.[39] The patient in this

---

[37] *Id.* at 1291.

[38] *Biomed Pharm., Inc. v. Oxford Health Plans (NY), Inc.*, No. 10 CIV. 7427 JSR, 2011 WL 803097, at *4 (S.D.N.Y. Feb. 18, 2011).

[39] *See Encompass Office Solutions, Inc. v. La. Health Serv. & Indem. Co.*, 2013 U.S. Dist. LEXIS 188315, at *26-27 (N.D. Tex. Sept. 17, 2013) ("Although it did not lead to a direct out-of-pocket damage to the patient, failure to pay as directed would nonetheless . . . [injure] the patient in that [insurers] refused to honor the directions of the insured concerning services within the purview of the insurance contract."); *see also Katz v. Pershing, LLC*, 672

circumstance is being denied use of funds rightfully hers. The fact that she has directed the funds elsewhere does not change that reality.[40] From a different angle, failure to pay also denies the patient the benefit of her bargain. In purchasing her Cigna plan she agreed to pay for coverage at out-of-network providers like North Cypress, and Cigna is failing to uphold the bargain by paying for covered services. ERISA is designed "to protect contractually defined benefits"[41] and has a "repeatedly emphasized purpose" of doing so.[42] The contract law concept of benefit of the bargain is a friendly fit.

The Second Circuit has recognized that a union agreement requiring an employer to pay benefits for retirees gave the union standing to enforce the employer's duty to pay those benefits. The "refusal to pay . . . injure[s] the Union by depriving it of the benefit of its bargain. That this benefit accrues to third parties, namely, the retirees, does not change the fact that the Union has negotiated for the benefit and has incurred obligations . . . to secure it."[43] In

---

F.3d 64, 72 (1st Cir. 2012) ("[W]e think the better view is that when a plaintiff generally alleges the existence of a contract, express or implied, and a concomitant breach of that contract, her pleading adequately shows an injury to her rights."); *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 263 (3d Cir. 2008) ("To have standing to assert a breach of contract claim, plaintiffs need not wait until lawsuits against them were filed or collection agents began harassing them . . . . The expense is incurred, whether paid or not, at the time the patient enters a hospital with the understanding that he or she is liable for all or part of the charges for the services to be rendered." (citation omitted and internal quotation marks omitted)).

The question of whether the money is in fact owed goes to the merits. Arguably, the money is owing as soon as the patient incurs covered charges, regardless of whether they are billed to her directly.

[40] At least some of the contracts at issue state that benefits are payable to the patient, and will only be paid to a provider at Cigna's option. See, for example, page 53 of Exhibit 48 to Cigna's Motion for Summary Judgment.

[41] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113-14 (1989) (quoting *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985)).

[42] *Russell*, 473 U.S. at 148.

[43] *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC v. Cookson Am., Inc.*, 710 F.3d 470, 474-75 (2d Cir. 2013).

the union context, other circuits have recognized this right to enforce one's contracts, even if the benefits accrue to others.[44]

The patients contracted for coverage at out-of-network providers under their insurance plans. The patients allegedly incurred charges for medical care, and directed that the payments be made to the provider, but the contracted-for payments have not been made. The patients have thus allegedly been deprived of what they contracted for, a concrete injury.

## B.

Plan members also enjoy the protection of ERISA. ERISA is designed to promote the interests of plan participants and their beneficiaries, "and to protect contractually defined benefits."[45] ERISA further protects patients' right to "full and fair review" of their claims,[46] and holds fiduciaries to certain standards.[47] To these ends, ERISA section 502(a)(1)(B) empowers a plan participant to sue "to recover benefits due him under the terms of the plan, to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the plan."[48] Congress's creation of this cause of action has given patients a right to enforce the insurance coverage they contracted for. They were given a right to recompense for an actual injury and have standing to pursue alleged breaches of this statutory duty.

---

[44] *See Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am.*, 440 F.3d 809, 815-16 (6th Cir. 2006); *United Steelworkers of Am., AFL-CIO v. Canron, Inc.*, 580 F.2d 77, 80-81 (3d Cir. 1978).

[45] *Firestone Tire*, 489 U.S. at 113-14; *see also Russell*, 473 U.S. at 148.

[46] 29 U.S.C. § 1133(2).

[47] *See* 29 U.S.C. § 1104(a)(1)(B) & (D).

[48] 29 U.S.C. § 1132(a)(1)(B). ERISA further allows suit to "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." *Id.* at § 1132(a)(3).

No. 12-20695

C.

Tellingly, Cigna responds to the argument that patients did not get what they bargained for in part by stating that "Cigna covered [the patients'] claims."[49] This goes to the merits, not standing. Cigna further urges that we should be persuaded by courts which have found no Article III injury in the absence of a threat that patients will be billed,[50] but these cases fail to persuade in the face of the principles already discussed and our long endorsement of ERISA assignments.[51] The patients here assigned their rights under their insurance contracts to North Cypress, and North Cypress has standing to enforce the contracts. We have consistently held that the ability of patients to assign their claims to medical providers is both permissible and beneficial.[52]

Nor is there any question on this record but that any patient's injury is caused by Cigna's refusal to pay North Cypress as directed, and a favorable decision awarding North Cypress damages is likely to redress the injury. The "irreducible constitutional minimum of standing" is thus satisfied.[53] In short,

---

[49] Cigna Initial Br. 35-36.

[50] *See, e.g.*, *Cedars-Sinai Med. Ctr. v. Massachusetts Mut. Life Ins. Co.*, 67 F.3d 305, at *3 (9th Cir. 1995) (unpublished). This case was decided in part based on a determination that the insurer was not obligated to pay charges not billed to the patients—a question that goes to the merits rather than to standing here. *See also Am. Med. Ass'n v. United HealthCare Corp.*, No. 00 CIV. 2800 (LMM), 2007 WL 1771498, at *19 (S.D.N.Y. June 18, 2007).

[51] *See, e.g., Harris Methodist Fort Worth v. Sales Support Servs. Inc. Employee Health Care Plan*, 426 F.3d 330, 333-34 (5th Cir. 2005) ("It is well established that a healthcare provider, though not a statutorily designated ERISA beneficiary, may obtain standing to sue derivatively to enforce an ERISA plan beneficiary's claim."); *id.* at 337 (noting the benefits of allowing assignment to health care providers, and stating that "[t]o deny standing to health care providers as assignees of beneficiaries of ERISA plans might undermine Congress' goal of enhancing employees' health and welfare benefit coverage" (quoting *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286, 1289 n.12 (5th Cir. 1988))); *Tango Transp. v. Healthcare Fin. Servs. LLC*, 322 F.3d 888, 892-93 (5th Cir. 2003).

[52] *See* supra note 51.

[53] *See Lujan*, 504 U.S. at 560-61.

No. 12-20695

North Cypress also has statutory standing under ERISA[54] for the benefit claims at issue because of assignments from plan beneficiaries.[55]

D.

Cigna argues that if we find standing we ought nonetheless to affirm the grant of summary judgment against North Cypress's benefit underpayment claims on the merits;[56] that its reading of the plan language was "legally correct" or otherwise within its discretion, and that its actions rested on "substantial evidence."[57] Analysis of Cigna's plan interpretation proceeds in two steps.[58] The first question is whether Cigna's reading of the plans is "legally correct." The "most important factor to consider" in the legal correctness inquiry is whether Cigna's "interpretation is consistent with a fair reading of the plan[s]."[59] ERISA requires that summary plan descriptions "be written in a manner calculated to be understood by the average plan participant, and . . . be sufficiently accurate and comprehensive to reasonably apprise such participants . . . of their rights and obligations."[60] Accordingly, "ERISA plans are interpreted in their ordinary and popular sense

---

[54] *See* 29 U.S.C. §§ 1132(a)(1)(B) & (a)(3).

[55] *Dallas Cnty. Hosp. Dist. v. Associates' Health & Welfare Plan*, 293 F.3d 282, 285 (5th Cir. 2002) ("It is clear in this Circuit that a health care provider may possess standing under ERISA by virtue of a valid assignment."). As already noted, we leave it to the district court in the first instance to resolve Cigna's attacks on the existence and adequacy of some of the assignments at issue.

[56] "We are not limited to the district court's reasons for its grant of summary judgment and may affirm . . . on any grounds supported by the record." *Vuncannon v. United States*, 711 F.3d 536, 538 (5th Cir. 2013) (quoting *Aryain v. Wal–Mart Stores Tex. LP,* 534 F.3d 473, 478 (5th Cir. 2008) and *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.,* 579 F.3d 502, 506 (5th Cir. 2009)) (footnotes omitted).

[57] *See Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010); *Holland v. Int'l. Paper Co. Ret. Plan*, 576 F.3d 240, 246 n.2 (5th Cir. 2009); *Aboul-Fetouh v. Employee Benefits Committee*, 245 F.3d 465, 472 (5th Cir. 2001). The parties appear to agree that the plans give Cigna discretion to construe plan terms.

[58] *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 257 (5th Cir. 2009).

[59] *Crowell v. Shell Oil Co.*, 541 F.3d 295, 313 (5th Cir. 2008) (quoting *Gosselink v. AT&T, Inc.,* 272 F.3d 722, 727 (5th Cir. 2001)).

[60] 29 U.S.C. § 1022(a).

16

as would a person of average intelligence and experience . . . [and] must be interpreted as they are likely to be understood by the average plan participant."[61] The inquiry is thus whether ordinary plan members who read that "payment for the following is specifically excluded from this plan: . . . charges for which you are not obligated to pay or for which you are not billed," would understand that they *have no insurance coverage* if they are not charged for coinsurance. That is, would a plan member understand the language to *condition* coverage on the collection of coinsurance, rather than simply describing the fact that the insurance does not cover all of a patient's costs. Also relevant is whether Cigna denied all coverage to patients who were not charged or "billed" for their copays or coinsurance by *in-network* providers.[62]

There are strong arguments that Cigna's plan interpretation is not "legally correct," in which case the inquiry proceeds to determine whether Cigna nonetheless had discretion to interpret the plan as it did.[63] On a finding that the plans, read correctly, do *not* condition coverage on collection of coinsurance, the question would be whether Cigna nevertheless had discretion to absolve itself of responsibility for payment of the greater part of thousands of claims. At this stage of the analysis, the inquiry would include among other factors, whether Cigna had a conflict of interest,[64] as well as the "internal consistency of the plan" and "the factual background of the determination and any inferences of lack of good faith."[65] If Cigna's interpretation was found to be either legally correct or within its discretion, a determination would also be

---

[61] *Stone*, 570 F.3d at 260 (internal quotation marks omitted) (quoting *Crowell*, 541 F.3d at 314).

[62] Another factor to consider at the "legal correctness" stage is "whether the administrator has given the plan a uniform construction." The third is whether "unanticipated costs" result from the various plan interpretations. *Crowell*, 541 F.3d at 312.

[63] *Stone*, 570 F.3d at 257.

[64] *Id.*

[65] *Threadgill v. Prudential Securities Group, Inc.*, 145 F.3d 286, 293 (5th Cir. 1998).

required as to whether its sweeping response to North Cypress's charges was based on "substantial evidence"[66] We say this much not to suggest an answer but only to underline the many issues Cigna asks us to decide. We cannot resolve the merits on this record, truncated as it was by the grant of summary judgment for want of standing.

There are thousands of plans at issue; it is evident from the sample we find in the record, small as it is, that the plans contain significantly different versions of key provisions. The parties also dispute whether Cigna applied its "fee-forgiving protocol" to reduce payments for MRC2 plans or only for MRC1 plans, and whether Cigna was operating under a conflict of interest as to either the Administrative Services Only or Cigna-funded plans.[67] Cigna also contends that many claims at issue were denied for reasons that had nothing to do with the fee-forgiving protocol, and that many claims suffer from a lack of proper assignment or a failure to exhaust administrative remedies. Whether Cigna had substantial evidence to support reducing payment on emergency room claims specifically is also uncertain on this record.[68]

Having rejected North Cypress's ERISA claims on standing grounds, the district court properly did not address the merits on this record of the many varied claims. In ruling on the claims arising from the "Discount Agreement" contracts—we will consider them in Part V—the district court *did* examine

---

[66] *Anderson*, 619 F.3d at 512 ("In addition to not being arbitrary and capricious, the plan administrator's decision to deny benefits must be supported by substantial evidence.").

[67] The district court recognized that any conflict of interest would have to be considered in evaluating Cigna's plan interpretation if that interpretation was not found to be "legally correct." We note that we also consider conflicts of interest as part of the "substantial evidence" inquiry. *See Holland*, 576 F.3d at 247-51 (considering conflict of interest as part of assessment of evidentiary basis for denial of benefits).

[68] In some filings, the parties seem to agree that North Cypress did not apply its discount program to MRC1 plan emergency room services, but that Cigna *did* apply its fee-forgiving protocol to such claims. In others Cigna argues that it had substantial evidence on which to reduce payment to emergency room claims.

No. 12-20695

Cigna's interpretation of provisions in many of the plans and the evidentiary basis for reducing payment.[69] However, that analysis is not directly applicable to the ERISA underpayment claims because it was filtered through state contract law and based on a much smaller universe of claims. We vacate and remand to allow the district court a full opportunity to consider all of North Cypress's claims for underpayment of benefits and its other closely related ERISA claims with a fully developed record, including claims that Cigna breached duties owed its insureds under ERISA.

V.

We turn next to the grant of summary judgment against North Cypress's state contract law claims. According to the hospital, Cigna breached the terms of the "Discount Agreements"—contracts between North Cypress and Cigna requiring Cigna to pay a negotiated amount for specific insurance claims. The contracts by their terms are subject to the underlying ERISA plans.

The district court first addressed whether the Discount Agreement claims were preempted by ERISA, which "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."[70] This provision is "intended to ensure that employee benefit plan regulation would be 'exclusively a federal concern,'"[71] and as such, the Supreme Court has commented that the preemption provision is "conspicuous for its breadth"[72] and is "deliberately expansive."[73] Nonetheless, the district court found that the

---

[69] Mem. and Order of August 10, 2012, 12-14, 20. Because we vacate the grant of summary judgment against the contract claims in order to allow the district court to address the question of ERISA preemption in the first instance, we need not review, and express no opinion on, the district court's decision on the merits.

[70] 29 U.S.C. § 1144(a).

[71] *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981)).

[72] *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990).

[73] *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987).

contract law claims were not preempted because North Cypress could not bring the claims under ERISA:

> This Court has already held that Plaintiffs do not have standing to bring their ERISA claims. Therefore, Plaintiffs' breach of contract claim is not preempted. *See Montefiore Med. Center v. Teamsters Local 272*, 642 F.3d 321, 328 n.7 (2d Cir. 2011) (explaining that the preempted claims must have been "brought by an individual who has standing to assert rights under ERISA § 502(a)(1)(B)"); . . . .[74]

The court went on to rule on the merits, finding no breach because Cigna was entitled to reduce payment under the terms of the "Discount Agreement" contracts.

In holding that North Cypress has standing to bring ERISA claims, we removed the foundation of the district court's preemption ruling.[75] The parties have not briefed the issue of whether the Discount Agreement claims nonetheless survive un-preempted. Accordingly, we vacate the grant of summary judgment and remand so that the district court may consider the question of preemption in light of our ruling on standing.

VI.

The vacating of the dismissal for want of standing does not impact the remaining claims and we turn to them. First, we address the dismissal of North Cypress's claims under Texas Insurance Code sections 843.338 and 843.351 as preempted by ERISA. These state laws set time standards for claim determinations, specifying how long a health maintenance organization has to

---

[74] Mem. and Order of August 10, 2012, 4-5.

[75] The district court earlier held that the contract claims were not preempted even if there *was* ERISA standing, but this 2011 decision is based on a finding that one would not need to interpret the ERISA plans in order to resolve the contract dispute. Because this later proved to be untrue, we do not find the court's earlier decision persuasive. *See* Mem. and Order of March 2, 2011.

No. 12-20695

pay a provider.[76] We conclude that the district court did not err in holding that these provisions of the Texas Insurance Code are preempted.

We have already noted ERISA's "deliberately expansive" preemption clause.[77] The clause is not without exception, however; the statute contains a savings clause providing that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."[78]

Following the Supreme Court's decision in *Kentucky Association of Health Plans, Inc. v. Miller*,[79] we have explained:

> [F]or a state law to be deemed a 'law . . . which regulates insurance' under [s]ection 1144(b)(2)(A) and thus be exempt from traditional ERISA preemption, such law must (1) be directed toward entities engaged in insurance, and (2) substantially affect the risk pooling arrangement between the insurer and the insured.[80]

We take a "common-sense view of the matter,"[81] and look to whether the statute is "specifically directed toward entities engaged in insurance."[82] Here, sections 843.338 and 843.351 both purport to regulate HMOs, which are unquestionably entities engaged in insurance.

Whether the law "substantially affect[s] the risk pooling arrangement between the insurer and the insured"[83] is more complicated. The Supreme Court has emphasized that this factor cannot be read to cover all laws that

---

[76] With certain exceptions, section 843.338 sets a 45-day deadline for nonelectronic claims and a 30-day deadline for electronic claims. Section 843.351 clarifies that the prompt payment provisions apply to out-of-network providers.

[77] *Dedeaux*, 481 U.S. at 46.

[78] 29 U.S.C. § 1144(b)(2)(A).

[79] 538 U.S. 329 (2003).

[80] *Ellis v. Liberty Life Assur. Co. of Bos.*, 394 F.3d 262, 276 (5th Cir. 2004) (citing *Miller*, 538 U.S. at 341-42).

[81] *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 365 (2002) (quoting *Metro. Life Ins. Co.* v. *Massachusetts*, 471 U.S. 724, 740 (1985)).

[82] *Miller*, 538 U.S. at 342.

[83] *Id.*

21

affect an insurance company, "[o]therwise, any state law aimed at insurance companies could be deemed a law that 'regulates insurance.'"[84] Laws that meet the second *Miller* factor are those which "alter the scope of permissible bargains between insurers and insured,"[85] including those which "expand[] the number of providers from whom an insured may receive health services,"[86] those governing "whether or not an insurance company must cover claims submitted late, which dictates to the insurance company the conditions under which it must pay for the risk it has assumed,"[87] and those determining whether an "insured [may] seek insurance from a closed network of health-care providers in exchange for a lower premium."[88] In *Ellis* v. *Liberty Life Assurance Company of Boston*,[89] we further clarified the *Miller* "risk pool arrangement." We first ruled that *Miller* did not cover remedial provisions, which are those that "provide remedies to which the insured may turn when injured by the bad faith of the insurer."[90] We then turned to the nature of risk pools more broadly, concluding that "[w]ithin the insurance industry, risk signifies the risk of occurrence of injury or loss for which the insurer contractually agrees to compensate the insured."[91] Because the provisions in that case were not addressed to such risk, they were preempted.

---

[84] *Id.* at 338; *see also id.* ("A state law requiring all insurance companies to pay their janitors twice the minimum wage would not 'regulate insurance,' even though it would be a prerequisite to engaging in the business of insurance, because it does not substantially affect the risk pooling arrangements undertaken by insurer and insured.").

[85] *Id.* at 338-39.

[86] *Id.* at 338.

[87] *Id.* at 339 n.3.

[88] *Id.* at 339.

[89] 394 F.3d 262 (5th Cir. 2004).

[90] *Id.* at 277 (internal quotation marks omitted) (quoting *Barber v. Unum Life Ins. Co. of Am.*, 383 F.3d 134, 143 (3d Cir. 2004)).

[91] *Id.* (internal quotation marks omitted) (quoting *Barber*, 383 F.3d at 143).

No. 12-20695

Returning to the state laws affecting the time for payment of provider claims,[92] the inquiry now is whether the timing provisions "'alter the scope of permissible bargains between insurers and insureds' and thus substantially affect the risk-pooling 'arrangements that insurers may offer.'"[93] The laws certainly affect the scope of bargains between insurer and *provider*, given that they prohibit the insurer from agreeing to a later payment date to the provider than provided by statute. That is not enough. In *Miller*, the Supreme Court highlighted examples of provisions which affect risk pooling,[94] including (1) mandated-benefit laws "that require an insurer to provide a certain kind of benefit to cover a specified illness or procedure,"[95] (2) a notice-prejudice rule which requires the "insurers show prejudice before they may deny coverage because of late notice,"[96] (3) a provision providing health insurance recipients a "right to independent medical review of certain denials of benefits,"[97] and (4) "any willing provider" statutes which limit insurers' ability "to limit the number of providers with access to their networks."[98] Key to these examples is that all of them implicate provisions which concern rights that the *insured* has under the insurance contract—be that a mandatory condition of coverage or access to certain providers. Here, the laws in question only implicate rights between the provider and insurer, and do not obviously address the bargain struck between insurer and insured.[99]

---

[92] *See* Tex. Ins. Code. §§ 843.338, 843.351.

[93] *Ellis*, 394 F.3d at 277 (quoting *Miller*, 538 U.S. at 338-39).

[94] *See Miller*, 538 U.S. at 337, 339, 341.

[95] *Metro. Life Ins. Co.*, 471 U.S. at 728.

[96] *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 372 (1999).

[97] *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 359 (2002).

[98] *Miller*, 538 U.S. at 332.

[99] In *Miller*, the Court, describing the notice-prejudice rule at issue in *Unum Life Insurance Company of America v. Ward*, 526 U.S. 358, held that: "[t]he notice-prejudice rule governs whether or not an insurance company must cover claims submitted late, which dictates to the insurance company the conditions under which it must pay for the risk that it has assumed. This certainly qualifies as a substantial effect on the risk pooling arrangement

No. 12-20695

Nor does this type of law obviously affect the risk pool, at least as that term was defined by *Miller*.[100] In the examples the Court highlighted, the definition of risk pool appeared to focus on two factors—the benefits an insured has access to and, to a lesser extent, the population covered.[101] The prompt payment statutes do not substantially affect either of these factors.

This is not to say that the laws have no incidental effects on either the number of insureds or their benefits. Laws governing how quickly insurers must pay providers implicate the required cash reserves of insurers, and thus the type of coverage the company could sustain. Such laws might also affect the type and number of providers who choose to enter into contractual arrangements with insurers, since payment provisions presumably have an effect on choices of insurance networks by medical professionals. But given *Miller*'s instruction, these potential indirect impacts do not "substantially affect the risk pool arrangement between the insurer and the insured."[102]

Two arguments remain. First, in *Ellis*, we held that "remedial provisions," which "provide remedies to which the insured may turn when

---

between the insurer and insured." *Miller*, 438 U.S. at 399 n.3. Unlike in *Miller*, the laws at issue here do not govern whether or not an insurer must pay; rather they specify the *processes* by which payment must be made.

[100] While the *Miller* Court held that, to be saved, "a state law must substantially affect the risk pooling arrangement between the insurer and insured," thus conflating to some extent the insurer/insured bargain and impact on the risk pool factor, these appear to be distinct concepts, at least within the insurance industry. *See* Beverly Cohen, *Saving the Savings Clause: Advocating a Broader Reading of the Miller Test to Enable States to Protect ERISA Health Plan Members by Regulating Insurance*, 18 Geo. Mason L. Rev. 125, 144 (2010). In light of this, several courts have concluded that the term "risk pooling" has a different meaning in the ERISA preemption context. *See, e.g.*, *Standard Ins. Co.* v. *Morrison*, 537 F. Supp. 2d 1142, 1151 (D. Mont. 2008) (rejecting the argument that "the Court intended lower courts to interpret 'risk pooling' as an insurance industry actuary would").

[101] While none of the four examples the Court gave in *Miller* directly discussed the pool size, the type of examples it gives in *Ward* and *Metro Life* do concern access to coverage. Moreover the plain meaning of "risk pool" necessarily entails a numerosity component.

[102] *Miller*, 538 U.S. at 342.

injured by the bad faith of the insurer," are preempted.[103] While Cigna argues this rule applies here, the prompt payment statutes at issue in this case do not provide remedies for the insured or provider in the event of late payment, and are not remedial.[104] Second, North Cypress relies on our decision in *Lone Star OB/GYN Associates v. Aetna Health, Inc.*[105] for the proposition that ERISA preemption did not apply to prompt payment act claims. That case, looking at a dispute between a provider and an insurance company, held that "[a] claim that implicates the *rate* of payment as set out in the Provider Agreement, rather than the *right* to payment under the terms of the benefit plan . . . is not preempted by ERISA."[106] This case is inapposite. *Lone Star* was based on the conclusion that the contract between the provider and insurer created an "independent legal duty" distinct from the rights of the provider's patients under the ERISA plans.[107] Here, North Cypress's state insurance code claims were based directly on the benefits described in its patients' ERISA plans. We affirm the district court's holding that the prompt payment provisions at issue are preempted by ERISA.

## VII.

North Cypress argues that it properly pled claims under RICO. The district court held that North Cypress failed to state a plausible claim upon which relief could be granted under any RICO provision, and thus dismissed these claims under Rule 12(b)(6).[108]

Subsections 1962(a)-(d) of RICO essentially state that:

---

[103] *Ellis*, 394 F.3d at 277 (internal quotation marks omitted).

[104] *See id.* at 274-75 (recognizing that the statutes at issue "subjects insurance companies to civil liability" if they "breach the common law duty of good faith and fair dealing" or if they "unfairly and untimely process and treat a claim").

[105] 579 F.3d 525 (5th Cir. 2009).

[106] *Id.* at 530.

[107] *Id.* at 530-31.

[108] Mem. and Order of November 3, 2011, 6.

No. 12-20695

(a)    a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise;

(b)    a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering activity;

(c)    a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and

(d)    a person cannot conspire to violate subsections (a), (b), or (c).[109]

Three elements are common to claims brought under any of these subsections: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise."[110] The district court found that North Cypress presented sufficient facts to plead a pattern of racketeering activity,[111] but not the individual RICO subsections. We consider each subsection in turn.

## A. 18 U.S.C. § 1962(a)

Subsection 1962(a) prohibits a person who has received income from a pattern of racketeering activity from investing that income in an enterprise.[112] To state a claim under § 1962(a), North Cypress had to plead: "(1) the existence of an enterprise, (2) the defendant's derivation of income from a pattern of racketeering activity, and (3) the use of any part of that income in acquiring an interest in or operating the enterprise."[113] Additionally, North Cypress had to show a nexus between the claimed violations and injury.[114] The injury "must

---

[109] *Crowe v. Henry*, 43 F.3d 198, 203 (5th Cir. 1995).

[110] *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007).

[111] Mem. and Order of November 3, 2011, 7-10.

[112] *Crowe*, 43 F.3d at 203.

[113] *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir. 2000).

[114] *Id.*

## No. 12-20695

flow from the use or investment of racketeering income."[115] "[A]lleging an injury solely from the predicate racketeering acts themselves is not sufficient because § 1962(a) does not prohibit those acts."[116]

The district court found two deficiencies in North Cypress's § 1962(a) pleading. First, North Cypress did not plead that Cigna used any part of its income to acquire an interest in or operate the alleged enterprise.[117] Second, North Cypress did not explain how the use or investment of racketeering income injured North Cypress.[118] North Cypress does not challenge these two specific determinations, offering only the conclusion that it sufficiently pled a § 1962(a) violation. This is not sufficient. The district court did not err in dismissing this claim.

### B. 18 U.S.C. § 1962(b)

To state a claim under § 1962(b), North Cypress had to show that its injuries "were proximately caused by a RICO person gaining an interest in, or control of, the enterprise through a pattern of racketeering activity"—a nexus requirement.[119] The district court found that North Cypress did not successfully plead a nexus between its claimed injuries and Cigna's acquisition or maintenance of an interest in the enterprise.[120] On appeal, North Cypress insists in general terms that it successfully pled a § 1962(b) violation, but it does not explain how it showed such a nexus. The district court was correct in dismissing this claim.

---

[115] *Id.*

[116] *Nolen v. Nucentrix Broadband Networks Inc.*, 293 F.3d 926, 929 (5th Cir. 2002).

[117] Mem. and Order of November 3, 2011, 11.

[118] *Id.*

[119] *Abraham*, 480 F.3d at 357 (internal quotation marks omitted); *see also Vanderbilt Mortg. & Fin., Inc. v. Flores*, 735 F. Supp. 2d 679, 701 (S.D. Tex. 2010); *Blanchard & Co., Inc. v. Contursi*, No. Civ. A. 99-1758, 2000 WL 574590, at *2 (E.D. La. May 11, 2000).

[120] Mem. and Order of November 3, 2011, 12.

No. 12-20695

## C.  18 U.S.C § 1962(c)

Subsection 1962(c) "prohibits any *person* employed by or associated with any *enterprise* from participating in or conducting the affairs of the enterprise through a pattern of racketeering activity."[121] To state a claim under § 1962(c), North Cypress had to demonstrate, among other things, "that the RICO person is distinct from the RICO enterprise."[122]

There are two Cigna enterprises involved in this case: Cigna Healthcare, Connecticut General Life Insurance Company ("CGLIC"), and Cigna Healthcare of Texas, Inc. ("CHT"). North Cypress asserts that CGLIC is the "person" under § 1961(c) because it is the parent or controlling company. And that CGLIC "has taken steps to cause [CHT] to be an 'enterprise' for illegal racketeering activities under the guise and direction of Cigna's alleged fee forgiving investigations."[123] But, as the district court correctly noted, simply alleging that the parent company is the RICO person and the subsidiary is the RICO enterprise cannot satisfy the distinctiveness requirement.[124] Because North Cypress did not sufficiently demonstrate that CGLIC and CHT were distinct, it did not state a plausible claim for relief. The district court was correct in dismissing this claim.

## D.  18 U.S.C. § 1962(d)

Subsection 1962(d) prohibits a conspiracy to violate §§ 1962(a), (b), or

---

[121] *Abraham*, 480 F.3d at 357 (internal quotation marks omitted) (emphasis original).

[122] *Id.*

[123] Second Amended Original Complaint, ¶ 88.

[124] *See ISystems v. Spark Networks, Ltd.*, No. 10-10905, 2012 WL 3101672, at *4-5 (5th Cir. March 21, 2012); *Khurana v. Innovative Health Care Sys., Inc.*, 130 F.3d 143, 155 (5th Cir. 1997), *vacated on other grounds by Teel v. Khurana*, 525 U.S. 979 (1998); *Office Outfitters, Inc. v. A.B. Dick Co., Inc.*, 83 F. Supp. 2d 772, 779-80 (E.D. Tex. 2000); *Compagine De Reassurance D'Ille de France v. New England Reinsurance Corp.*, 57 F.3d 56, 91-92 (1st Cir. 1995); *Lorenz v. CSX Corp.*, 1 F. 3d 1406, 1411-12 (3d Cir. 1993).

No. 12-20695

(c).[125] To prevail on a RICO conspiracy claim, North Cypress had to demonstrate "(1) that two or more people agreed to commit a substantive RICO offense and (2) that [the defendants] knew of and agreed to the overall objective of the RICO offense."[126] Since North Cypress failed to properly plead a claim under §§ 1962(a), (b), or (c), it correspondingly failed to properly plead a claim under § 1962(d).[127] The district court correctly dismissed North Cypress's conspiracy claims. The district court was correct in its determination that North Cypress failed to plead a violation under any of the RICO subsections, and we affirm.

## VIII.

Two of the court's orders were filed under seal, but the district court later granted Cigna's motion to unseal them[128]—a decision North Cypress appeals. We review the district court's unsealing order for abuse of discretion.[129] The district court's discretion to seal records "is to be exercised charily" given the public's common law right of access, and we are "loath to second guess" a decision not to seal documents.[130] However, sealing may be appropriate where orders incorporate confidential business information.[131]

---

[125] *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996).

[126] *Chaney v. Dreyfus Service Corp.*, 595 F.3d 219, 239 (5th Cir. 2010) (quoting *United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir. 1999)).

[127] *See Nolen*, 293 F.3d at 930 ("The 'failure to plead the requisite elements of either a § 1962(a) or a § 1962(c) violation implicitly means that [the defendant] cannot plead a conspiracy to violate either section.'") (quoting *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1084 (9th Cir. 2000)); *see also Pan Am. Mar., Inc. v. Esco Marine, Inc.*, No. C.A. B-04-188, 2005 WL 1155149, at *8 (S.D. Tex. May 10, 2005).

[128] Mem. and Order of September 27, 2012, 1.

[129] *See S.E.C. v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993); *Macias v. Aaron Rents, Inc.*, 288 F. App'x 913, 915 (5th Cir. 2008).

[130] *Macias*, 288 F. App'x at 915.

[131] *See Nixon v. Warner Commun., Inc.*, 435 U.S. 589, 598 (1978).

No. 12-20695

North Cypress argues that the analysis in the two orders "is constructed entirely from confidential business records and proprietary information."[132] Furthermore their unsealing has caused "North Cypress' competitive standing [to be] substantially harmed."[133] However, North Cypress does not identify any particular confidential information in the orders that may cause it harm, and much of the information therein is available elsewhere. We are not persuaded that the district court abused its discretion in unsealing these orders.

IX.

Cigna argues that the district court erred in dismissing its ERISA counterclaims as prescribed, holding that a two-year statute of limitations applied and was not tolled by North Cypress's filing suit.

A.

As there is no statute of limitations for claims under ERISA § 502(a)(3), we look to state law for the most analogous cause of action.[134] The district court looked to unjust enrichment, with its two-year statute of limitations,[135] while Cigna argues that fraud—with its four-year state of limitations—is more apt.

"Unjust enrichment claims are based on quasi-contract."[136] Unjust enrichment "characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay."[137] Generally, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory, such as unjust

---

[132] North Cypress Initial Br. 57.

[133] *Id.* at 58.

[134] *Hogan v. Kraft Foods*, 969 F.2d 142, 145 (5th Cir. 1992) (citing *Kennedy v. Electricians Pension Plan, IBEW # 995*, 954 F.2d 1116 (5th Cir. 1992)).

[135] Mem. and Order of July 25, 2012, 8.

[136] *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683 (Tex. 2000).

[137] *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex. App. 2009).

enrichment."[138] Here, the ERISA plans cover the subject matter of the dispute. However, the Texas Supreme Court has held that "in some circumstances, overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment."[139]

> The elements of fraud are:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act on it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.[140]

Further, "[m]aterial means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question."[141]

Cigna argues that its counterclaims seek redress for North Cypress's fraudulent over-reports of its charges. Notwithstanding the existence of a contract, we agree with the district court that Cigna's counterclaim is more akin to a claim for unjust enrichment than one for fraud.[142] As the district court carefully explained, the "counterclaim hinges on whether [] overpayments were made in contravention of the plan terms, not on whether [North Cypress's]

---

[138] *City of the Colony v. North Tex. Mun. Water Dist.*, 272 S.W.3d 699, 731 (Tex. App. 2008).

[139] *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 469-70 (Tex. 1998) (listing cases).

[140] *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774 (Tex. 2009)).

[141] *Id.* (quoting *Smith v. KNC Optical, Inc.,* 296 S.W.3d 807, 812 (Tex. App. 2009)).

[142] *See Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot and Wansbrough*, 354 F.3d 348, 360 (5th Cir. 2003) (stating in a different context that funds paid out by a plan and retained in violation of plan terms constituted unjust enrichment of the holder), *abrogated on other grounds by ACS Recovery Services, Inc. v. Griffin*, 723 F.3d 518 (5th Cir. 2013).

conduct was fraudulent."[143] Indeed, given that North Cypress expressly informed Cigna of its discounts prior to any representations about charges, fraud seems particularly inapt. The district court correctly concluded that a two-year statute of limitations was appropriate.

## B.

Cigna also argues that the statute of limitations for its counterclaims should have been tolled from the initial date of North Cypress's complaint. The district court determined that Cigna's counterclaims were compulsory, but that because the counterclaims sought affirmative relief the statute of limitations should not be tolled.[144]

Although based on distinct universes of benefits claims, North Cypress's claims and Cigna's counterclaims arise from the same "core of facts,"[145]—North Cypress's prompt pay discount. The district court thus correctly determined that Cigna's counter-claims were compulsory because they have a logical relationship to North Cypress's claims.[146]

It has been observed that:

---

[143] Mem. and Order of July 25, 2012, 8. As the district court explained, "recovery is not predicated upon intentional, false representations by [North Cypress]. Rather, the core of [Cigna's] claim is that [North Cypress] listed charges on claim forms without requiring patients to pay the full amount of those listed charges. In turn, the 'plans made overpayments to [North Cypress] in the amount of the difference between the benefits that the plans paid and the benefits to which the plan members were contractually entitled, based on the amounts that [North Cypress] actually required them to pay.'" *Id.* (citations omitted).

[144] *Id.* at 15.

[145] A logical relationship "exists when the claim and the counterclaim arise from the same 'aggregate of operative facts,' or 'the aggregate core of facts upon which the original claim rests activates additional rights, otherwise dormant, in the defendants.'" *Rossi v. Wohl*, 633 F.Supp. 2d 270, 285 (N.D. Tex. 2009) (quoting *Nayani v. Horseshoe Entm't*, No. 3:06-CV-01509-M, 2007 WL 1288047, at *2 (N.D. Tex. May 2, 2007).

[146] A counterclaim is compulsory when "(1) . . . the issues of fact and law raised by the claim and counterclaim largely are the same; (2) . . . *res judicata* would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) . . . substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; [or] (4) . . . there is [a] logical relationship between the claim and the counterclaim." *Park Club, Inc. v. Resolution Trust Corp.*, 967 F.2d 1053, 1058 (5th Cir. 1992).

[a]lthough there is some conflict on the subject, the majority view appears to be that the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim. This approach precludes plaintiff, when the claim and counterclaim are measured by the same period, from delaying the institution of the action until the statute has almost run on defendant's counterclaim so that it would be barred by the time defendant advanced it.[147]

But of course this view has most force when tolling is allowed for defensive relief. We have repeatedly stated or suggested without holding that statutes of limitations of counterclaims seeking *affirmative* relief are not tolled; stating that "[a]s a purely defensive procedure, [recoupment] is available to defendant so long as plaintiff's claim survives—even though an affirmative action by defendant is barred by limitations."[148] We have made similar statements about the special status of recoupment or the inapplicability of tolling to counterclaims for affirmative relief without ever holding that affirmative counterclaims are not tolled.[149]

Cigna urges that we should be guided by our recent unpublished holding in *Ruben A.* that an affirmative-relief counterclaim to an Individuals with Disabilities Education Act (IDEA) suit was not barred by IDEA's statute of

---

[147] § 1419 Compulsory Counterclaims—Statute of Limitations, 6 Fed. Prac. & Proc. Civ. § 1419 (3d ed.) (footnote omitted).

[148] *Distribution Servs., Ltd. v. Eddie Parker Interests, Inc.*, 897 F.2d 811, 812-13 (5th Cir. 1990) ("The rationale is that because recoupment is in the nature of a defense, it is never barred by the statute of limitations so long as the plaintiff's main action itself is timely.").

[149] *See, e.g.*, *Pennsylvania R. Co. v. Miller*, 124 F.2d 160, 162 (5th Cir. 1941) ("Recoupment goes to the foundation of the plaintiff's claim; it is available as a defense, although as an affirmative cause of action it may be barred by limitation."); *Matter of Gober*, 100 F.3d 1195, 1207-08 (5th Cir. 1996) ("Defensive claims for recoupment are never subject to statutes of limitations as long as the plaintiff's action is timely. Counterclaims for setoff, however, are subject to the applicable statute of limitations just as if they were asserted as independent actions.") (internal citations omitted); *see also Kadonsky v. United States*, 216 F.3d 499, 507 n.9 (5th Cir. 2000) ("Counterclaims in the nature of recoupment filed after the statute of limitations has run are nonetheless timely if the suit prompting the counterclaim were timely.").

limitations.[150] There we approvingly cited the Third Circuit's statement that tolling compulsory counterclaims is "the fairer rule."[151] However, our holding was firmly footed in IDEA's specific statute of limitations language, which "limits the time in which a party may '*bring an action*' in federal court."[152] We determined that asserting a compulsory counterclaim is not "bringing an action" and noted that IDEA's express language made it unnecessary to distinguish between affirmative and defensive counterclaims.[153]

Here, we are squarely called upon to answer the question not reached by *Ruben A.*. We are persuaded and hold that compulsory counterclaims seeking affirmative relief are not tolled.[154]

————————————

We VACATE the district court's grants of summary judgment against North Cypress's ERISA claims and breach of contract claims,[155] and REMAND for further proceedings. We AFFIRM the remainder of the district court's judgment.

---

[150] *Ruben A. v. El Paso Independent School District*, 414 F. App'x 704, 707 (5th Cir. 2011).

[151] *Id.* (citing *Jonathan H. v. The Souderton Area Schl. Dist.*, 562 F.3d 527, 529 (3d Cir. 2009).

[152] *Id.* (emphasis added).

[153] *Id.* at 706-07.

[154] Sound policy reasons support enforcing statutes of limitations. *See CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2183, *reh'g denied*, 135 S. Ct. 23 (2014) (noting that statutes of limitations "require plaintiffs to pursue diligent prosecution of known claims" and "promote justice by preventing surprises through [plaintiffs'] revival of claims that have been allowed to slumber") (internal quotation marks omitted); *Taylor v. Bunge Corp.*, 775 F.2d 617, 619 (5th Cir. 1985) (emphasizing the "policy of finality underlying the statute of limitations").

[155] This includes the claims for state law damages and attorney's fees. *See* Second Amended Complaint, Counts 6, 9-11.