4 U.S. 325
 4 Dall. 325
 1 L.Ed. 853
 Searight
v.
Calbraith et al.
Calbraith et al.
v.
Searight.
 Circuit Court, Pennsylvania District.
 April Term, 1796
 
 1
 SEARIGHT agreed, in February 1792, to sell to Calbraith & Co. a bill of exchange for 150,000 livres tournois, drawn upon Bourdieu, Chollet, and Bourdieu of London, payable in Paris, six months after sight; for which Calbraith and Co. agreed to pay at the rate of 17 pence the livre, (making in the whole, 10,625l. Pennsylvania currency) in their own notes, dated the 1st of May, and payable the 1st of July 1792. The bill was, accordingly drawn and delivered to Calbraith and Co. who indorsed it to George Barclay and Co. of London, by whom it was presented for acceptance; and on the 27th of March 1792, Bourdieu, Chollet, and Bourdieu accepted the bill, 'payable at the domicil of Messrs. Cottin, Jonge, and Girardot, at Paris.' George Barclay and Co. afterwards indorsed and forwarded the bill to G. Olivier, who, on the 6th of October 1792, presented it for payment to Messrs. Cottin, Jonge, and Girardot; and those gentlemen tendered payment in assignats, which, by the then existing laws of France, were made a lawful tender, in payment of debts. Mr. Olivier refused to receive the assignats, by order of George Barclay and Co., declaring, at the same time, that he would receive no other money than French crowns; and thereupon each party protested against the act of the other. The bill being returned under protest for non-payment, Searight, on the one hand, instituted a suit, to recover the sum which Calbraith and Co. had originally stipulated to pay; and, on the other hand, Calbraith and Co. instituted a suit to recover damages for the protest of the bill. And these suits were agreed to be tried together, by the same jury.
 
 
 2
 On the trial of the cause, evidence was produced, on both sides, to ascertain and fix the precise terms of the original contract, for the sale and purchase of the bill of exchange; particularly as to the stipulation of a rate for estimating the livre; as to the purchase being made for cash, or on credit; and as to the knowledge and view of the parties, relative to the existence of assignats, or the law of France, making them a legal tender in payment of debts. And the great question of fact for decision, was, whether the parties contracted for a payment in gold and silver; or tacitly left the medium of payment, to the laws of France, where the bill was payable? The law arising from the fact, was discussed at large, according to the different positions of the parties in interest.
 
 
 3
 For Searight, it was shown, by the decrees of the French government, that assignate were established as a circulating medium for the payment of debts, before, and at the time of, the contract for the bill of exchange: Decree of 16 and 17 April 1790. s. 3. King's Proclamation of 19 April 1790. and this fact being known, it was contended, that the purchase of a bill payable in France, must in itself import an agreement to receive in satisfaction, the lawful current medium of that country, unless the contract expressly provides against it, which, on the present occasion, was controverted and denied. In support and illustration of the general position, and its incidents, the following authorities were cited. 2 Burr. 1078, 9. 1083. Dav. Rep. 26, 7, 8. Dyer, 82, 83. 4 Com. Dig. 556. B. 7, 8. 2 P. Wms. 88, 89. 1 P. Wms. 696. Prec. Ch. 128. 2 Vern. 395. 2 Atk. 382. 465. Skin. 272. 4 Com. Dig. 256. B. 8. 4 Vin. Abr. 258. O. 13. Holt, 465. Davis' Rep. 24. 10 Mod, 37. 2 Br. Chan. 1 Smith's Wealth of Nations, 41. 1 Dall. Rep. 257. 1 Br. Ch. 376. Esp. N. P. 48. 26. 3 Wils. 211. Esp. N. P. 140, 1. Doug. 628. 3 T. Rep. 683. 554. 3 Bl. Com. 435. Salk. 130. 126. 12 Mod. 192. Kyd, 63.
 
 
 4
 For Calbraith and Co. it was contended, that an express contract had been proved to pay the bill in specie; that the very terms of the bill import the same understanding of the parties; that however binding the law of France may be on cases between French citizens, or between American and French citizens, it did not affect contracts between Americans; that, in legal contemplation, there has been neither a payment, nor a tender of payment; and that Searight has sustained no damage, nor shown any right to recover. 1 Pow. on Contr. 8. 2 Pow. on Contr. 158. Cun. B. of E. 258. Skin 272. 3 Watson's Philip 3, 136. 1 Ld. Raym. 735. 1 Lev. 111. Esp. N. P. 169. Bull. N. P. 156. 6 Mod. 305. 3 Burr. 1353. 2 Black. 435. 466. 6 Mod. 306. Davis' Rep. 75, 6. Skin. 272.
 
 
 5
 IREDELL, Justice.
 
 
 6
 The contract for the purchase of the bill of exchange is sufficiently proved, as it is laid in the declaration, by the entry made, at the time, in the books of Calbraith and Co. The sole question, therefore, in the cause is, whether the tender of assignats, in payment of the bill, was a compliance with that contract? The notarial protest, not only states the tender, but certifies, that assignats were lawful money of France, in payment of debts. A notary should, indeed, certify all the facts that occur, in relation to the protest (not merely the refusal to pay, according to the demand) but, it is doubtful, whether his assertion would be conclusive, as to the lawfulness of the money tendered. Connected, however, with other evidence, it is proper for the consideration of the jury.
 
 
 7
 It has been objected that as Oliver's demand was, exclusively, for a payment in French crowns, no proof of a tender in any other mode, is necessary; but I do not concur in this opinion. After such a demand, it was, perhaps, unnecessary for the party to exhibit the assignats to Olivier; but the form of the demand, on one side, cannot dispense with the obligation, on the other side, to make a tender of payment, agreeably to his own sense of the law and the contract. The jury must, therefore, be satisfied, that although the money was not produced and counted, it was actually in the possession of the party making the tender.
 
 
 8
 On the principal question, I thought, at first, that the risk, as to the mode of payment, must be run by the holder of the bill; but the case in Skinner, 272. sanctioned by the high authority of Holt's name, transcribed, without remark, into Comyn's excellent digest, and uncontradicted by any other adjudication, must be respected in every Court of law, and completely effaces the first impressions of my mind. Upon examination, too, the doctrine of that book appears to be founded in just and legal principles. Every man is bound to know the laws of the own country; but no man is bound to know the laws of foreign countries. In two cases, indeed, (and, I believe, only in two cases) can foreign laws affect the contracts of American citizens: 1st. Where they reside, or trade, in a foreign country; and, 2d. Where the contracts, plainly referring to a foreign country for their execution, adopt and recognize the lex loci. The present controversy, therefore, turns upon the fact, whether the parties meant to abide by the law of France? And this fact the jury must decide.
 
 
 9
 As to the damages, if the verdict should be for Searight, though it is true that in actions for a breach of contract, a jury should, in general, give the whole money contracted for and interest; yet, in a case like the present, they may modify the demand, and find such damages, as they think adequate to the injury actually sustained. But if the jury should in the first action (Searight v. Calbraith and Co.) find, either wholly or partially for the defendant; in the second action (Calbraith and Co. v. Searight) they should find for the defendant generally.
 
 
 10
 PETERS, Justice.
 
 
 11
 The decision depends entirely on the intention of the parties, of which the jury must judge. If a specie payment was meant, a tender in assignats was unavailing. But if the current money of France was in view, the tender in assignats was lawfully made, and is sufficiently proved.
 
 
 12
 When the jury were at the bar, ready to deliver verdicts, the plaintiff in each action, voluntarily suffered a nonsuit. It was afterwards declared, however, that in Searight v. Calbraith and Co. the verdict would have been, generally, for the defendants; and that in Calbraith and Co. v. Searight, the verdict would have been for the plaintiffs, but with only six pence damages.