RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0169p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JASON SPRINGER,

*Plaintiff-Appellant*,

*v.*

CLEVELAND CLINIC EMPLOYEE HEALTH PLAN TOTAL
CARE,

*Defendant-Appellee*.

┐
│
│
│
│
> No. 17-4181
│
│
│
│
┘

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:15-cv-00020—Christopher A. Boyko, District Judge.

Argued:  June 13, 2018

Decided and Filed:  August 14, 2018

Before:  COLE, Chief Judge; CLAY and THAPAR, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Drew Legando, LANDSKRONER GRIECO MERRIMAN LLC, Cleveland, Ohio,
for Appellant.  Jeffrey J. Wedel, ZASHIN & RICH CO., L.P.A., Cleveland, Ohio, for Appellee.
Christine D. Han, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for
Amicus Curiae.  **ON BRIEF:**  Drew Legando, LANDSKRONER GRIECO MERRIMAN LLC,
Cleveland, Ohio, for Appellant.  Jeffrey J. Wedel, ZASHIN & RICH CO., L.P.A., Cleveland,
Ohio, for Appellee.  Marcia Bove, UNITED STATES DEPARTMENT OF LABOR,
Washington, D.C., for Amicus Curiae.

COLE, C.J., delivered the opinion of the court in which CLAY and THAPAR, JJ., joined.
THAPAR, J. (pp. 9–12), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

COLE, Chief Judge.   Sometimes it's easier to seek forgiveness than permission. Jason Springer hoped as much when he arranged air ambulance transportation for his son before his employee benefit plan could verify his membership and authorize the service. But the plan administrator denied Springer's claim for coverage because he did not obtain the precertification required for nonemergency transportation. The district court affirmed and alternatively found that Springer did not suffer an injury to have Article III standing. Although Springer has standing to bring his claim, we agree that the plain language of the plan required precertification. We affirm.

## I.  BACKGROUND

Jason Springer, a physician in Utah, began a fellowship at the Cleveland Clinic in Ohio on July 1, 2010. He enrolled his family in its employee benefit plan, which was administered by Antares Management Solutions. Springer's coverage began on July 1 but required about fifteen business days to process enrollment paperwork. The plan provided that claims rendered during the enrollment period "may be denied" but "will be adjusted on the backend when [Antares] processes your benefit selections data." (*Id.*)

On July 7, Springer had his fourteen-month-old son, J.S., transported from a Utah hospital to the Cleveland Clinic by Angel Jet's air ambulance service. J.S. had been hospitalized since birth for multiple congenital abnormalities, including omphalocele (protrusion of abdominal organs from the navel) and pulmonary hypoplasia (underdeveloped lungs). He required a mechanical ventilator to breathe.

J.S.'s physician prepared a letter of medical necessity for the air ambulance service. He explained that J.S. could not be safely transported by any other means because of the distance and his health conditions, which required close monitoring for suctioning of secretions, potential airway compromise, and possible respiratory failure. The letter, dated June 3, found that J.S. was

"stabilized for transfer and will continue to progress with continued care." (R. 15-2, PageID 150.)

Before the flight, Angel Jet sought coverage information from Antares. Antares was unable to confirm that Springer and his son were members of the plan while their enrollment paperwork was processing and did not precertify the air ambulance service. Angel Jet decided to proceed with the transportation on July 7 and submitted a bill to Antares for $340,100. After initially approving the claim, Antares denied it a few days later for failure to obtain precertification.

Angel Jet appealed the determination to Cleveland Clinic Employee Health Plan Total Care ("Total Care"). Total Care affirmed the denial but issued Angel Jet a check for $34,451.75, approximately ten percent of the billed charges. Total Care explained that the payment was "an attempt to be fair" and reflected the amount their preferred provider of air ambulance services would have charged. (R. 17-28, PageID 729; R. 16-15, PageID 325.) The Advisory Committee, which exercises the final level of appeal under the plan, affirmed.

Angel Jet brought suit under the Employee Retirement Security Act ("ERISA") for the remainder of its $340,100 bill. The district court dismissed the suit, finding that Springer had not properly assigned his rights under the plan to Angel Jet. *Angel Jet Services, LLC v. Cleveland Clinic Emp. Health Plan Total Care*, 34 F. Supp. 3d 780, 783 (N.D. Ohio 2014). Springer then brought his own claim as a plan participant under ERISA Section 502(a)(1)(B). The district court affirmed the plan's denial of benefits. The court found that Springer did not suffer an injury to have Article III standing because he received the air ambulance service and was not personally billed for any of the expenses. Even if Springer had standing, the court alternatively concluded that the determination was not arbitrary and capricious because J.S.'s transportation was not an emergency or precertified as required for a nonemergency.

Springer now appeals.

## II.  ANALYSIS

### A.  Article III Standing

We must first decide whether we have jurisdiction to review Springer's claim. To meet the requirements for Article III standing, Springer bears the burden of showing: (1) an injury in fact that is "concrete and particularized" and "actual or imminent," (2) that the injury is fairly traceable to the challenged action of the defendant, and (3) that the injury is likely to be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016). The parties only dispute whether Springer suffered a concrete injury when Angel Jet did not bill him for the air ambulance service.

Springer suffered an injury within the meaning of Article III because he was denied health benefits he was allegedly owed under the plan. Like any private contract claim, his injury does not depend on allegation of financial loss. His injury is that he was denied the benefit of his bargain. Springer purchased a health plan that said it would "pay 100% for transportation— including . . . air ambulance," but Total Care only paid about ten percent of his air ambulance expense. (R. 15-1, PageID 103.) The plan confers standing to appeal a determination in that circumstance (*id.* at PageID 136), while ERISA enforces his right "to recover benefits due to him under the terms of his plan" in a civil action. 29 U.S.C. § 1132(a)(1)(B).

Every circuit court to consider this issue agrees that a plaintiff in Springer's shoes does not need to suffer financial loss. The Fifth, Ninth, and Eleventh Circuits have each held that the denial of plan benefits is a concrete injury for Article III standing even when patients were not directly billed for their medical services. *North Cypress Med. Ctr., Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 192–94 (5th Cir. 2015); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1289–91 (9th Cir. 2014); *HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001), *overruled on other grounds by Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008). For example, in *North Cypress*, a hospital had standing to bring an ERISA claim seeking coverage from a plan even though the patient-assignors "were never at imminent risk of out-of-pocket expenses." 781 F.3d at 192. The court concluded that a patient-assignor suffers a concrete injury

whenever she is denied "use of funds rightfully hers" or "the benefit of her bargain," "regardless of whether she has directed the money be paid to a third party for her convenience." *Id.* at 193. The injury therefore stemmed from traditional principles of contract law that did not depend on financial harm.

Total Care argues that these cases are distinguishable because they concern the standing of assignors rather than the participants themselves. Springer did not perfect his earlier attempt to assign his rights under the plan to Angel Jet and brought this claim on his own behalf. But the reason those courts found standing is because assignees acquire the same legal right as participants to seek payment directly from the plans. *North Cypress*, 781 F.3d at 193; *Spinedex*, 770 F.3d at 1291; *HCA*, 240 F.3d at 991. Non-participant health care providers cannot bring their own ERISA claims—they do so derivatively, relying on the participants' contractually defined rights and therefore the participants' standing at the time of the assignment. *Spinedex*, 770 F.3d at 1289. As the Ninth Circuit explained, if the plaintiffs in question were the participants themselves, "they would have had an unquestioned right to bring suit for benefits." *Id.* at 1291. "No one"—except Total Care—"would contend that the beneficiaries would have lacked Article III standing in that circumstance." *Id.*

Total Care also argues that standing here would be inconsistent with our decision in *Soehnlen. See Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576 (6th Cir. 2016). In *Soehnlen*, we held that a class of plaintiffs did not have Article III standing to challenge their plan's benefit caps because they alleged procedural violations of ERISA "without showing which specific fiduciary duty or specific right owed to them was infringed." *Id.* at 585. The plaintiffs did not assert that they exercised any right under the plan that would be impeded by its noncompliance with ERISA and merely argued "that the pecuniary limitations imposed by the Plan exist." *Id.* at 582 (citations omitted). Unlike those plaintiffs, Springer does not allege bare procedural violations unconnected to an individual right under the plan. There is no dispute that Springer alleges a specific contractual right owed to him and his son as plan participants.

Springer has therefore suffered a concrete injury sufficient for Article III standing.

**B.  Standard of Review**

We review an ERISA claim for denial of benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The Supreme Court "has made it abundantly clear that discretion is *not* the norm." *Anderson v. Great West Life Assur. Co.*, 942 F.2d 392, 394 (6th Cir. 1991) (emphasis in original) (citing *Firestone*, 489 U.S. at 112). The plan must therefore confer discretion "expressly" and "clear[ly]" for arbitrary and capricious review to apply. *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1571 (6th Cir. 1992) (citations omitted). Otherwise, "[*d*]*e novo* review is the default rule." *Anderson*, 942 F.2d at 395.

Antares does not have a clear grant of discretionary authority under the plan. The plan assigns Antares seven discrete tasks in its capacity as third-party administrator, including "[m]ember eligibility verification" and "[b]enefit coverage determinations." (R. 15-1, PageID 85.) The district court found that responsibility sufficient to apply arbitrary and capricious review based on our decision in *Emerson*, where a plan parroted the language of our precedent in granting the administrator "the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 845–46 (6th Cir. 2000). But without that express grant, we have rejected the proposition "that the right to make coverage determinations presupposes discretionary authority." *Tiemeyer v. Community Mut. Ins. Co.*, 8 F.3d 1094, 1099 (6th Cir. 1993); *see also Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1373–74 (6th Cir. 1994). Following a checklist is not the same as defining the checklist.

The Advisory Committee does not appear to have a clear grant of discretionary authority either. Relying on our decision in *Eaton*, Total Care argues that arbitrary and capricious review applies because the Advisory Committee has final and binding review of third-level appeals. *See Eaton*, 970 F.2d at 1572. But *Eaton* also involved an express grant of discretionary authority, conferring the final review committee with "all such powers and authority as may be necessary to carry out the provisions of this plan." *Id.* at 1571–72. Unlike that administrator, the Advisory Committee may not be involved in the determinations process at all. The plan only recognizes its

role when a dispute "cannot be resolved" in two earlier appeals, which are subject to Total Care's own "final and binding" review. (R. 15-1, PageID 136.) That singular authority is "quite distinct from the issue whether the [p]lan confers a zone of discretion on the administrator with respect to the content and standards for decision making." *Ramsey v. Hercules Inc.*, 77 F.3d 199, 206 (7th Cir. 1996).

In any case, we do not need to resolve whether the plan language is sufficiently clear to overcome the presumption of de novo review. Springer's claim fails under either standard.

### C. Eligibility for Coverage

Springer has not demonstrated that he was entitled to reimbursement for the air ambulance service. Even applying de novo review, the plain language of the plan precludes his claim.

The plan unambiguously requires precertification as a condition of coverage. The provision Springer relies upon states that the plan "will pay 100% for transportation—including . . . air ambulance" for a sick or injured member outside of the Cleveland area, but "[t]his type of transportation to a Cleveland Clinic Hospital must meet the precertification process." (R. 15-1, PageID 103.) A claim submitted during the enrollment period is "adjusted on the backend" but not exempt from precertification. (R. 15-1, PageID 79.) The plan explains in bold-face, capitalized, and italicized font: "**If precertification is required and *NOT* obtained, EHP Total Care is not obligated to reimburse for services even if it is a covered benefit.**" (R. 15-1, PageID 130 (emphasis in original).) In case that were not clear, the plan reiterates: "If the member does not participate in the precertification process before obtaining the service there will be **NO REIMBURSEMENT** for the service." (*Id.* at PageID 98 (emphasis in original).) The weary-eyed could not overlook the requirement.

J.S.'s transportation was not an emergency to otherwise sidestep the precertification process. The plan defines an "emergency" as a medical condition reasonably expected to result in serious harm in "the absence of immediate medical attention." (R. 16-18, PageID 420.) There is no evidence in the record that J.S. required "immediate medical attention" on July 7 and could not wait another week or so for his enrollment paperwork to be processed. To the contrary, the

physician's letter of medical necessity—dated June 3—stated that J.S. was stable and planned for his transportation on a date scheduled over a month later.

Springer argues that precertification should nonetheless be excused as "impossible" during the enrollment period because his membership could not be verified. Under ERISA regulations, denial of a claim for failure to obtain precertification would be unreasonable "under circumstances that would make obtaining such prior approval impossible or where application of the prior approval process could seriously jeopardize the life or health of the claimant." 29 C.F.R. § 2560.503-1(b)(3). The example provided is an unconscious claimant "in need of immediate care at the time medical treatment is required." *Id.* In other words, a plan should provide an exception for emergency situations—and the plan here does that. The regulations do not require a plan to also exempt nonemergency services and effectively forego any precertification requirement. Nor was the processing period an unforeseeable event that made compliance impossible under general principles of contract law. The plan provides notice that "claims may be denied" in the period of "approximately 15 business days from the time your paperwork is received by Human Resources to the time your benefit selection is processed." (R. 15-1, PageID 79.)

Because Springer did not show the transportation was an emergency or obtain the precertification required for a nonemergency, he was not entitled to reimbursement under the plan.

### III.  CONCLUSION

We affirm the judgment of the district court.

—————————

## CONCURRENCE

—————————

THAPAR, Circuit Judge, concurring.   When Dr. Jason Springer sued for breach of contract, he was attempting to vindicate his own private rights rather than the rights of the public at large.  As such, he did not need to demonstrate concrete and particularized harm to satisfy standing.  An invasion of his legal rights was enough.  I write separately to explain why.

When the Cleveland Clinic hired Dr. Springer, he enrolled his family in the Cleveland Clinic's employee benefit plan ("Total Care").  As part of his family's relocation from Utah, he needed to transport his infant son—who has been hospitalized since birth—by air ambulance. The plan, however, required him to obtain pre-approval.  He did not.  Thus, Total Care denied his reimbursement claim—leaving Dr. Springer on the hook for the full cost.  The air ambulance service, however, never charged (or threatened to charge) Dr. Springer a dime.  As a result, Total Care alleges that he has suffered no damages and does not have standing to sue.

In discussing standing, courts (and litigants) often lose sight of the first principles that animate the doctrine.  Standing is about the limits of judicial power.  The federal judiciary only has the power to decide "Cases" or "Controversies"—all other disputes are left to the political branches.  U.S. Const. art. III; *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (explaining that standing is an "'essential and unchanging part' of Article III's case-or-controversy requirement, and a key factor in dividing the power of government between the courts and the two political branches" (citation omitted)).  In order for a dispute to be a case or controversy, the party bringing the claim must have standing, or, in other words, they must be the *appropriate* party to file suit.  If a party brings a claim to vindicate their private rights, standing can be straightforward.  Since the founding, a lawsuit seeking to vindicate an individual's private rights has counted as a case or controversy for purposes of Article III.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1551 (2016) (Thomas, J., concurring); 1 William Blackstone, *Commentaries on the Laws of England* *119 (describing private rights as those that "appertain and belong to particular men, merely as individuals or single persons").  As a private right, it would be *their* right to vindicate.  But a lawsuit seeking to vindicate a *public* right presents a

harder question.  When a plaintiff seeks to vindicate a right belonging "to the people at large," there is always a risk that he will call upon the courts to test the abstract legality of the government's actions.  *Lansing v. Smith*, 4 Wend. 9, 21 (N.Y. 1829); *see also Spokeo,* 136 S. Ct. at 1553 (Thomas, J., concurring).  And weighing in on the abstract legality of a government action pushes the court into the forbidden territory of the other branches.  After all, "[v]indicating the public interest (including the public interest in Government observance of the Constitution and laws) is a function of Congress and the Chief Executive," not the courts.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576 (1992) (emphasis omitted).  So to ensure that the plaintiff bringing a public-rights lawsuit presents a true case or controversy (i.e., that they are the appropriate party to file this public-rights lawsuit), the plaintiff must show that *he* has actually suffered a concrete and particularized harm.  *Id.* at 560.

Since the requirements of standing turn on whether the plaintiff seeks to vindicate a private or public right, the first step in any standing case is to classify the asserted right.  An easy way to think of this distinction is to think of criminal and tort law.  Imagine that Sam punches Jon in the face.  He has harmed both the public (by committing a crime) and Jon (by committing a battery).  While Jon cannot bring criminal charges against Sam, Jon can bring a private tort suit.  Now imagine Jon's face is made of steel and Sam's punch bounces right off.  Jon has no harm in the traditional sense, but since his "personal, legal rights [have been] invaded," he may still sue.  *See Spokeo,* 136 S. Ct. at 1551 (Thomas, J., concurring) ("[C]ourts historically presumed that the plaintiff suffered a *de facto* injury merely from having his personal, legal rights invaded." (citations omitted)); *see also* 3 Blackstone, *Commentaries* at *120 (noting that battery was actionable whether or not the victim felt pain).  But Jon can neither prosecute Sam nor ask the court to force the executive to do so.  *See Lujan*, 504 U.S. at 577 ("To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" (citations omitted)).

So how do courts determine whether a litigant has asserted a private right?  We look back to the rights that common law courts allowed private litigants to enforce.  *See, e.g.*, *Coleman v.*

*Miller*, 307 U.S. 433, 469–70 (1939). And in cases ranging from assault to trespass to slander, there was no question that private litigants could vindicate their rights before a court. *See De S. & Wife v. W. de S.*, (1348 or 1349) Y.B. 22 Edw. 3, f. 99, pl. 60 (assault); *Robert Marys's Case*, (1613) 77 Eng. Rep. 895 (K.B.) (trespass); *Crittal v. Horner*, (1618) 80 Eng. Rep. 366 (K.B.) (slander). This was true regardless of whether a violation of the private right caused a concrete or particularized harm—the violation alone was enough to justify a judicial remedy. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (Marshall, C.J.) ("[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." (quoting 3 Blackstone, *Commentaries* \*23)).[1]

Here, Dr. Springer sued to vindicate his private rights. He claimed that Total Care denied him health insurance benefits under his ERISA plan. Those health benefits represent a bargained-for exchange that vest in Dr. Springer as an individual. And when rights vest in an individual—rather than the whole community—we consider those rights "private." 3 Blackstone, *Commentaries* \*2; Francis Plowden, *Jura Anglorum* 487–88 (1792). Dr. Springer does not share his health benefits the same way he shares, say, waterway transportation. His health benefits do not belong to "the people at large." *Lansing*, 4 Wend. at 21. No one else can claim his contractual rights, and prior litigation in this case even confirms that point. *See Angel Jet Servs., LLC v. Cleveland Clinic Emp. Health Plan Total Care*, 34 F. Supp. 3d 780, 783 (N.D. Ohio 2014).

Moreover, the fact that ERISA governs this action does not transform Dr. Springer's private right into a public one. After all, Congress can create civil remedies for private rights. *E.g.*, *Huntington v. Attrill*, 146 U.S. 657, 676–77 (1892) ("But as [the statute] gives a civil remedy, at the private suit of the creditor only, and measured by the amount of his debt, it is as to

---

[1]*See also Webb v. Portland Mfg. Co.*, 29 F. Cas. 506, 507–08 (C.C.D. Me. 1838) (Story, J.) ("Actual, perceptible damage is not indispensable as the foundation of an action. The law tolerates no farther inquiry than whether there has been the violation of a right."); *Whittermore v. Cutter*, 29 F. Cas. 1120, 1121 (C.C.D. Mass. 1813) (Story, J.) ("[W]here the law gives an action for a particular act, the doing of that act imports of itself a damage to the party. Every violation of a right imports some damage, and if none other be proved, the law allows a nominal damage."); *Ashby v. White*, (1703) 92 Eng. Rep. 126, 137 (Q.B.) (Holt, C.J., dissenting) ("[S]urely every injury imports a damage, though it does not cost the party one farthing, . . . for a damage is not merely pecuniary, but an injury import damage, when a man is thereby hindered of his right."); *Green v. Cole*, (1670) 85 Eng. Rep. 1037 (K.B.); Joseph Story, Commentaries on the Law of Agency § 217 ("Where the breach of duty is clear, it will . . . be presumed, that the party has sustained a nominal damage.").

him clearly remedial. To maintain such a suit is . . . simply to enforce a private right secured under its laws to an individual."). Here, ERISA does not give Dr. Springer his rights; the health plan does. ERISA merely provides a mechanism through which Dr. Springer can enforce those underlying, bargained-for rights. *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985) (claiming that Congress created ERISA to "protect contractually defined benefits"). Using this mechanism, Dr. Springer essentially pled a breach-of-contract claim. And common law courts historically analyzed contractual claims using a private-rights framework. *Marzetti v. Williams*, (1830) 109 Eng. Rep. 842, 845 (K.B.) ("It is immaterial in such a case whether the action in form be in tort or in assumpsit. It is substantially founded on a contract; and the plaintiff, though he may not have sustained a damage in fact, is entitled to recover nominal damages."); *see also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (Chase, J.) ("The prohibitions . . . not to pass any law impairing the obligation of contracts, [was] inserted to secure private rights.").[2] They entertained breach-of-contract claims even when "no real loss be proved." *Clinton v. Mercer*, 7 N.C. (3 Murr.) 119, 120 (N.C. 1819); *accord Wilcox v. Plummer's Ex'rs*, 29 U.S. (4 Pet.) 172, 182 (1830). Such violations at least deserved nominal damages because the offender had invaded a private right. *E.g.*, *Marzetti*, 109 Eng. Rep. at 845.

Because Dr. Springer seeks to vindicate a private right against Total Care, he has standing to sue under Article III. And, as the majority correctly notes, he loses on the merits. As such, I concur.

---

[2]Sometimes courts analyze ERISA claims using trust law. *E.g.*, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–11 (1989) ("ERISA abounds with the language and terminology of trust law."). Although Dr. Springer's case more closely resembles a breach-of-contract claim, even construing his suit as a fiduciary-duty claim under trust principles would not defeat standing. Here, too, courts treated fiduciary claims as vindicating private rights. *See, e.g.*, *Keech v. Sandford*, (1726) 25 Eng. Rep. 223 (Ch.).