**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-2316
_____

LORENZO BUDET,
                                    Appellant

v.

RUTGERS BUSINESS SCHOOL; RUTGERS UNIVERSITY
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3:22-cv-02134)
District Judge: Hon. Robert Kirsch
_____

Argued: May 22, 2025

Before: BIBAS, PHIPPS, and AMBRO, *Circuit Judges*

(Filed: July 30, 2025)

Tyler J. Burrell        **[ARGUED]**
Gaetano J. DiPersia
Charles J. Kocher
MCOMBER MCOMBER & LUBER
50 Lake Center Drive, Suite 400
Marlton, NJ 08053
     *Counsel for Appellant*

DanaLynn T. Colao
Katherine A. Escanlar
William F. Maderer
Jeffrey Soos        **[ARGUED]**
SAIBER
18 Columbia Turnpike, Suite 200

Florham Park, NJ 07932
*Counsel for Appellee*

_____

OPINION*

_____

BIBAS, *Circuit Judge*.

Rankings fraud is serious. But even the gravest fraud cannot support a lawsuit if the plaintiff cannot plead a demonstrable injury. Almost a decade ago, Rutgers Business School allegedly lied about six of its full-time MBA graduates: It counted them as having gotten full-time jobs, but the jobs were secretly funded by Rutgers. If true, that meant Rutgers had inflated the school's employment statistics and possibly its full-time MBA ranking, thus defrauding any full-time MBA students who relied on the rankings in choosing its program.

An unlikely plaintiff then sued. Lorenzo Budet had enrolled at Rutgers Business School—but not as a full-time MBA student. He got an MBA certificate and a master's degree in supply-chain management. The certificate program, unlike the full-time MBA, is online and does not award an academic degree. After learning that Rutgers had allegedly lied about its employment statistics, Budet filed this class action. He alleges that, but for Rutgers inflating its ranking for the full-time MBA program, he would have gone to a cheaper, lower-ranked business school. But he never alleges, and could not say at oral

* This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

argument, what other schools he applied to or would have gone to and how much tuition he would have saved.

The District Court dismissed for lack of standing. Fed. R. Civ. P. 12(b)(1). Budet, it reasoned, had not pleaded an ascertainable loss: He had not alleged that Rutgers's rankings fell, so he had failed to plead that he had gotten less than what he bargained for. Plus, the ostensibly inflated employment numbers were for *full-time* MBA students. But Budet was not in the full-time program.

Budet now appeals. We review dismissals for lack of standing de novo. *N.J. Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 371 (3d Cir. 2015). And we hold that the District Court got it right.

To show standing, Budet's complaint threw spaghetti at the wall. He posited a hodge-podge of theories of harm, including that he would have picked a cheaper program, that he had not gotten what he bargained for, and that he had paid inflated tuition. But at argument, his counsel disavowed almost all those arguments. Now Budet defends only a single theory with two steps: But for Rutgers's lies, the ranking of its full-time MBA program would have been lower. And the inflated full-time MBA ranking spilled over to his master's degree and the MBA certificate, depriving Budet of the benefit of his bargain. Yet neither step holds water.

*First*, Budet does not plausibly plead that the fraud affected the full-time MBA rankings. On his telling, "2018 was when the fraud took place." Oral Arg. Tr. 12. But nothing in the pleadings suggests that the rankings ever fell afterwards. The best counsel could do is assert, at oral argument, that the rankings eventually fell in 2024—six years after the

3

alleged fraud, four years after the Covid pandemic scrambled everything, and two years after Budet first filed his complaint. But standing requires "causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). Here, any allegations supporting causation are at best "[t]hreadbare." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Budet does not plausibly plead that the alleged fraud changed the rankings, so he cannot trace any injury to Rutgers's conduct.

That pleading gap distinguishes this case from *United States v. Porat*, 76 F.4th 213 (3d Cir. 2023). There, a school official was charged with wire fraud in connection with a rankings-fraud scheme. As an element of wire fraud, prosecutors had to prove that the official had deprived students of money. In that criminal context, we held that rankings fraud could have affected the benefit of students' bargains. *Id.* at 221. Though we hesitate to apply our criminal precedents to civil standing, we need not decide that issue here because Budet has not pleaded anything approaching the facts in that case. In *Porat*, the deception caused the school's relevant rankings to soar and then crash. *Id.* at 216–17 (from #9 & #53 before the fraud, to #1 & #7 because of the lies, to "Unranked" & "Withdrew" after the fraud was exposed). By contrast, Rutgers's rankings stayed steady.

*Second*, although the flaw noted above is enough to foreclose standing, Budet's theory is especially speculative because he was never enrolled in the programs that he is suing over. Though Rutgers allegedly cooked the numbers for the full-time MBA rankings, he was enrolled in a master's degree in supply-chain management and an MBA certificate non-degree program.

4

Budet says that difference does not matter because the prestige of the MBA program spills over to all other Rutgers Business School programs. We could imagine how that might be true in theory: The Harvard brand makes a degree from Harvard's extension school worth more than one from Diploma Mill U. But Budet's assertion here is conclusory. And from what he does allege, his inference is not plausible. Rutgers allegedly manipulated the employment outcomes of six students, which counsel failed to plead affected the ranking of the targeted program. From there, he claims that this sleight of hand changed perceptions of Rutgers so radically that it burnished the reputation of *other* programs—but that is sheer speculation. So Budet has not borne his burden to plausibly plead that he suffered an injury in fact. *Finkelman v. NFL*, 877 F.3d 504, 511 (3d Cir. 2017); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Because the District Court got it right on standing, we will affirm. But because lack of standing deprived the court of jurisdiction, we will modify its dismissal to be without prejudice. *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 896 (3d Cir. 2020).

5

The Majority Opinion affirms the dismissal of a putative class action that brought claims for breach of contract, unjust enrichment, and statutory fraud against Rutgers University and Rutgers Business School. The Majority Opinion does so on the ground that the named plaintiff, Lorenzo Budet, lacks Article III standing. Just as "standing is not dispensed in gross," it is not evaluated in gross and must instead be assessed "for each claim" and "for each form of relief" that is sought. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). The Majority Opinion does the opposite and treats all of Budet's claims as a conglomerate. Compounding that mistake, the Majority Opinion's amalgamated analysis rests on the implicit assumption that the modern tripartite test for Article III standing replaced the traditional test for standing for claims that were recognized as cases or controversies at the Founding. In my view, that assumption is unjustified and erroneous. For that reason, as well as my disagreement about the application of the modern test to Budet's claim under the New Jersey Consumer Fraud Act, I respectfully dissent.

The doctrine of standing is derived from the case-or-controversy requirement in the text of Article III of the Constitution. *See* U.S. Const. art. III, § 2, cl. 1; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) ("[T]he doctrine of standing derives from the case-or-controversy requirement . . . ."). Under the traditional test for standing, the case-or-controversy requirement was satisfied when a plaintiff sought redress in a form recognized at the Founding – such as a common-law cause of action, a bill in equity, or an admiralty claim. *See* Samuel L. Bray & Paul B. Miller, *Getting Into Equity*, 97 Notre Dame L. Rev. 1763, 1771 (2022) (explaining that in the nineteenth century, the cause-of-action requirement "did much of the work we now attribute to standing doctrine" such

that there was no need for a federal court "to inquire whether there was a concrete injury, traceable to the defendant, that would be redressable by a favorable ruling"); *cf. SEC v. Jarkesy*, 603 U.S. 109, 122 (2024) (distinguishing "common-law forms of action" from "equity [and] admiralty jurisdiction" for purposes of the Seventh Amendment right to a jury trial (first quoting *Curtis v. Loether*, 415 U.S. 189, 193 (1974); and then quoting *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447 (1830))).  As Chief Justice Marshall explained in *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824), if a plaintiff "asserts his rights in the form prescribed by law[, i]t then becomes a case, and the constitution declares, that the judicial power shall extend to all cases arising under the constitution, laws, and treaties of the United States."  *Id.* at 819; *see also Forms of Action*, *Black's Law Dictionary* (1st ed. 1891) (defining 'Forms of Action' as "[t]he general designation of the various species or kinds of personal actions known to the common law, such as trover, trespass, debt, *assumpsit*, etc.").  Applying the traditional test here, claims for breach of contract and unjust enrichment were actions recognized at the Founding,[1] so they satisfy the case-or-controversy requirement and are within the judicial power of the United States.

Although bringing a claim recognized at the Founding was a sufficient condition for standing, the Supreme Court later recognized that it was not a necessary condition for standing.  *See Nash., Chattanooga & St. Louis Ry. Co. v. Wallace*, 288 U.S. 249, 264

---

[1] *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 127–29 (1810) (exercising jurisdiction over a case in which the parties sued for breach of covenant in a deed of land); *Searight v. Calbraith*, 4 U.S. (4 Dall.) 325, 327, 21 F. Cas. 927, 928 (C.C.D. Pa. 1796) (No. 12,585) (Iredell, Circuit Justice) (adjudicating a breach of contract dispute over the proper form of payment in foreign currency); *Developments in the Law – The Intellectual History of Unjust Enrichment*, 133 Harv. L. Rev. 2077, 2077 (2020) ("Unjust enrichment developed as a common law source of obligation and as an equitable principle . . . ."); *Overton v. Hudson*, 2 Va. (2 Wash.) 172, 177–78 (1796) (opinion of Roane, J.) (adjudicating an action for *indebitatus assumpsit*, a common law analog for unjust enrichment).

(1933) ("[T]he Constitution does not require that the case or controversy should be presented by traditional forms of procedure, invoking only traditional remedies."). During the twentieth century, with the increase of constitutional and statutory challenges to governmental action,[2] many of which were not traditionally recognized forms of action, the Supreme Court analyzed the common characteristics of the forms of action recognized at the Founding and distilled them into three requirements: (i) an injury-in-fact that is concrete, particularized, and actual or imminent; (ii) fairly traceable causation between the injury-in-fact and the defendant's conduct; and (iii) the likelihood that the exercise of traditional judicial powers would redress or prevent the injury-in-fact. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see, e.g.*, *Flast v. Cohen*, 392 U.S. 83, 98–101 (1968) (reviewing historical "complexities and uncertainties" in an effort to give "some meaningful form . . . to the jurisdictional limitations placed on federal court power by the concept of standing"). True to its origins in public-law litigation, the modern tripartite test was first applied to suits against the government and governmental actors,[3] but it has been extended to claims against private parties when redress is sought pursuant to a statutory cause of action.[4]

---

[2] *See, e.g.*, *Frothingham v. Mellon*, 262 U.S. 447, 479, 486 (1923) (suit by a taxpayer challenging the constitutionality of Congressional appropriations for maternal and infant health); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 211–12 (1974) (suit challenging Congressmen's receipt of reservist commissions as a violation of the Incompatibility Clause); *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 28, 32–33 (1976) (suit under the Administrative Procedure Act challenging an IRS ruling granting favorable tax status to a hospital); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 468–69 (1982) (suit by taxpayers claiming that the transfer of government property to a religiously affiliated college under the Property Clause violated the Establishment Clause).

[3] *See, e.g.*, *Valley Forge*, 454 U.S. at 469; *Lujan*, 504 U.S. at 559; *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 49 (1997); *Raines v. Byrd*, 521 U.S. 811, 814 (1997).

[4] *See, e.g.*, *TransUnion*, 594 U.S. at 417–18 (suit against a credit reporting agency for violating the Fair Credit Reporting Act); *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540–41 (2020) (suit against various private employers for violating ERISA); *Spokeo*, 578 U.S. at

3

Importantly, the modern tripartite test for Article III standing did not replace the traditional test – it merely supplemented it. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) ("We have always taken [the case-or-controversy requirement] to mean cases and controversies of the sort *traditionally* amenable to, and resolved by, the judicial process." (emphasis added)). Even though it is well derived, the modern test cannot extend beyond its bounds to bar legal causes of action or equitable claims that were understood to constitute a case or controversy at the Founding. If it did, then a judge-made test would supplant the original public meaning of the terms 'case' or 'controversy' in the text of Article III. Moreover, because the cases and controversies recognized at the Founding served as the data set from which the modern tripartite test for standing was derived, that modern test cannot be understood to exclude a claim that would have then qualified as a case or controversy. In short, a dispute of the kind that was recognized as a case or controversy at the Founding must still be one. Indeed, the Supreme Court, even in the modern era, has recognized the continuing vitality of the historical perspective essential to the traditional test. *See, e.g.*, *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008) ("We have often said that history and

334–36 (suit against a website for violating the Fair Credit Reporting Act); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 120–22 (2014) (suit against a manufacturer for violating the Lanham Act); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 88–89 (2013) (suit against a market competitor in a trademark dilution suit); *Chafin v. Chafin*, 568 U.S. 165, 169–71 (2013) (suit for an order for the return of a child under the International Child Abduction Remedies Act); *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 271–72 (2008) (suit against long-distance phone carriers under the Communications Act); *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 174–76 (2000) (suit against a waste treatment company under the Clean Water Act); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86–87 (1998) (suit against a manufacturing company for violating the Emergency Planning and Community Right-To-Know Act); *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 546–47 (1996) (suit against an employer for violating the Worker Adjustment and Retraining Notification Act); *Gollust v. Mendell*, 501 U.S. 115, 116–18 (1991) (suit against "a collection of limited partnerships, general partnerships, individual partners and corporations" for violating the Securities Exchange Act).

tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider."); *Flast*, 392 U.S. at 101 ("[I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related *only* to whether the dispute sought to be adjudicated will be presented in an adversary context and in *a form historically viewed as capable of judicial resolution*." (emphasis added)).  Accordingly, even if Budet's claims for breach of contract and unjust enrichment did not satisfy the modern test, he would have standing for those claims because they were recognized at the Founding.  *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 286–87 (2021) (explaining that, at common law, courts "reasoned that *every* legal injury necessarily causes damage" and that their "approach was followed both before and after ratification of the Constitution"); *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 290 (6th Cir. 2018) (Thapar, J., concurring) ("If a party brings a claim to vindicate their private rights, standing can be straightforward.  Since the founding, a lawsuit seeking to vindicate an individual's private rights has counted as a case or controversy for purposes of Article III."); *Attias v. CareFirst, Inc.*, 346 F.R.D. 1, 9 (D.D.C. 2024) ("American courts dating back to the Founding have permitted plaintiffs to bring suit based on the exact injury Plaintiffs have alleged: a breach of contract.  That was true regardless of whether the plaintiff incurred actual damages or, as here, sought to recover only nominal damages."); *Marsh & McLennan Agency LLC v. Williams*, 2025 WL 1265817, at *6 (S.D.N.Y. Apr. 30, 2025) ("[S]everal courts have followed this approach, holding that a bare breach of contract – one without an attendant monetary injury – is sufficient to confer Article III standing upon the party asserting the breach."); *see also Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 451 (5th Cir. 2022) ("[A] breach of contract is a sufficient injury for standing purposes."); *Servicios Azucareros de Venez., C.A. v. John*

5

*Deere Thibodeaux, Inc.*, 702 F.3d 794, 800 (5th Cir. 2012) ("Injuries to rights recognized at common law – property, contracts, and torts – have always been sufficient for standing purposes."); *Perry v. Newsom*, 18 F.4th 622, 639 (9th Cir. 2021) (Ikuta, J., dissenting) (observing that "a violation of private rights, including contract rights, whether or not the violation of such rights resulted in economic damage or other injury" is a "harm[] traditionally recognized as providing a basis for lawsuits in American courts" (quoting *TransUnion*, 594 U.S. at 425)).

For these same reasons, I do not dispute that the modern test for Article III standing governs Budet's statutory claims under the New Jersey Consumer Fraud Act,[5] but I believe that the Majority Opinion misapplies the modern test. Budet alleges that "[b]ut for Rutgers' deceptive reporting of admissions data that increased its rankings, [Budet] . . . would not have enrolled at Rutgers." 2d Am. Compl. ¶ 170 (App. 108). At the pleading stage, "federal courts typically credit allegations of injury that involve no more than 'application of basic economic logic,'" *Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016) (quoting *United Transp. Union v. Interstate Com. Comm'n*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989)), and it is basic economic logic that for educational programs, a higher rank increases applicant demand and the price point for the program, *cf.* N. Gregory Mankiw, *Principles of Economics* 389 (8th ed. 2018) (describing the signaling theory of education, under which "firms use educational

---

[5] *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 189, 196–203 (3d Cir. 2016) (applying the modern test for Article III standing to claims brought under the New Jersey Consumer Fraud Act). *See generally* N.J. Stat. Ann. § 56:8-19 (providing a private cause of action under the New Jersey Consumer Fraud Act); *Robey v. SPARC Grp. LLC*, 311 A.3d 463, 471 (N.J. 2024) (articulating the elements of a claim under the New Jersey Consumer Fraud Act as a "an ascertainable loss" causally related to a defendant's "unlawful practice"); *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 305 (3d Cir. 2016) (identifying the elements of a claim under the New Jersey Consumer Fraud Act and exercising jurisdiction over claims predicated on fraudulent post-graduation employment data).

attainment as a way of sorting between high-ability and low-ability workers"). The Majority Opinion acknowledges as much – at least for a Harvard degree. And thus, the Majority Opinion's analysis rests on its assessment that Budet's certificate from Rutgers is closer to "one from Diploma Mill U"; otherwise, it would be reasonable to infer that "the prestige of the MBA program spills over to all other Rutgers Business School programs." Maj. Op. at 5. At bottom, the Majority Opinion and Budet make the same point: prestige *does* matter. And here, by alleging that he thought that he was enrolling in a program at a school that had a certain level of prestige when it did not, Budet plausibly states that he overpaid. That suffices for an injury-in-fact fairly traceable to Rutgers's rankings inflation for Budet's statutory fraud claim – as well as for his breach of contract claim and his unjust enrichment claim (if the latter two were evaluated under the modern test for standing).

For these reasons, each of Budet's claims qualifies as a case or controversy over which the constitutional authority of federal courts extends, and the District Court erred in dismissing those claims for a lack of Article III standing.